[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-10243
_____

D.C. Docket No. 5:10-cv-00462-MTT

PANDITA CHARM-JOY SEAMAN,

Plaintiff-
Counter Defendant-
Appellee,

versus

JOHN KENNEDY PETERSON,

Defendant-
Counter Claimant-
Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(September 5, 2014)

Before FAY, Circuit Judge, and HODGES[*] and HUCK,[**] District Judges.

HODGES, District Judge:

This is a case governed by the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, TIAS No. 11670, S Treaty Doc. No. 99-11 (the "Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq.

The Appellant, John Kennedy Peterson, removed his four children from Mexico to the United States. His wife, and mother of the children, Pandita Charm-Joy Seaman, sued in the district court invoking ICARA and demanding an order returning the children to Mexico.[1] The district court granted that relief. Peterson appealed. We affirm.[2]

---

[*] Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

[**] Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

[1] The United States and Mexico are both signatories to the Convention. See Hague Convention on Private International Law:  Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M. 225, 225 (1994).

[2] We acknowledge both the extended period of time this case has been pending and the Supreme Court's unanimous admonition in Chafin v. Chafin, ___ U. S. ___, 133 S. Ct. 1017, 1027 (2013) that "courts can and should take steps to decide these cases as expeditiously as possible, for the sake of the children who find themselves in such an unfortunate situation." When this appeal was filed in early 2011 it was the law of the circuit that departure of the child or children from the United States pursuant to an ICARA decree in the district court rendered the case moot because of the perceived inability of the court to grant effective relief in the event of a reversal. Bekier v. Bekier, 248 F.3d 1051 (11th Cir. 2001). Here, with a favorable ruling from the district court in hand, and no stay order in place, Seaman and her children returned to Mexico on February 8, 2011. Then, on August 3, 2011, this court applied the rule of Bekier and

2

I    Jurisdiction

At the outset of this appeal we noted the presence of a question concerning this court's jurisdiction, and we subsequently entered an order carrying that issue with the case.

The jurisdictional issue arises because the district court entered a dispositive opinion and "order" on January 14, 2011, but deferred entry of a separate final judgment pending an assessment of Seaman's "fees and expenses."  Peterson filed his notice of appeal five days later on January 19, 2011.  A separate "judgment" was then entered by the court on March 7, 2011, confirming the court's dispositive order of January 14, 2011, and awarding costs and attorney's fees that had been left unresolved by the January order.  No additional or supplemental notice of appeal was filed by Peterson with respect to the judgment entered March 7.  Thus, if the district court's dispositive order of January 14, 2011, was not a final, appealable order under 28 U.S.C. § 1291 because of the unresolved fees and costs, the notice of appeal was ineffective concerning that order, and since no other notice of appeal was filed addressing the judgment entered March 7, this court lacks jurisdiction of the case.

---

dismissed Peterson's appeal as moot.  Peterson sought a writ of certiorari which the Supreme Court granted on February 25, 2013.  The dismissal of Peterson's appeal was vacated and the case was remanded in light of Chafin which had abrogated Bekier.  Peterson v. Seaman, ___ U.S. ___, 133 S. Ct. 1452 (2013).  The appeal was then reinstated; but, without fault on the part of anyone, much precious time was consumed in the interim.

We believe the proper resolution of this issue is dictated by Budinich v. Becton Dickinson and Co., 486 U.S. 196, 108 S. Ct. 1717 (1988) and the Supreme Court's more recent decision in Ray Haluch Gravel Co. v. Central Pension Fund of Int'l Union of Operating Eng'rs, ___ U. S. ___, 134 S. Ct. 773 (2014) abrogating this court's decision in Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso P.A. v. MedPartners, Inc., 312 F.3d 1349 (11th Cir. 2002).

Budinich involved a suit under Colorado law by an employee seeking recovery of unpaid compensation. Judgment was entered on a jury verdict for the employee in an amount that was less than he had claimed. The employee then moved for an award of attorney's fees based upon Colorado decisional law, not on the basis of his contract or statute. The employee did not file a notice of appeal from the judgment until after the district court had resolved the issue of fees. A unanimous Supreme Court concluded that the notice of appeal was untimely with respect to the judgment entered on the verdict. The finality of a judgment, the Court said, should not depend upon whether an unresolved claim for attorney's fees is part of the "merits" of the cause of action, or is "nonmerits" and collateral to that claim. Rather, the Court said, preservation of operational consistency and predictability in the overall application of §1291 "requires, we think, a uniform rule that an unresolved issue of attorney's fees for the litigation in question does

4

not prevent judgment on the merits being final." Budinich, 486 U.S. at 202, 108 S. Ct. at 1722.

Nevertheless, the interpretation and application of Budinich by the courts of appeals was not uniform. Some, including our court, continued to adhere to the rule that where a claim for attorney's fees was based upon a provision in a contract that was also the source of the broader claim on the merits, the question of a fee award was a merits issue and no judgment could be final until the fee dispute was determined. Specifically, in MedPartners, Inc., supra, we said that "[i]n this circuit, a request for attorneys' fees pursuant to a contractual clause is considered a substantive issue; and an order that leaves a substantive fee issue pending cannot be 'final.'" 312 F.3d at 1355 (citing Ierna v. Arthur Murray Int'l. Inc., 833 F.2d 1472, 1476 (11th Cir. 1987)).

In Ray Haluch Gravel Co., however, a unanimous Supreme Court abrogated our decision in MedPartners and held that the general rule of Budinich applies with equal force to a claim for fees based on a contract as it does to claims based upon a statute or decisional law. It is now clear, therefore, that an order disposing of the case, except for awardable fees and costs, is a final and appealable order even though the fees and costs are recoverable, as in this case, pursuant to statute (42 U.S.C. § 11607(b)(3)) and are, arguably, a part of the merits of the claim. Here, the district court's dispositive order of January 14, 2011, ruled upon all of the

5

substantive issues relating to the return of the Peterson children to Mexico including Seaman's entitlement to the costs of transportation.  It was a final, appealable order and this court has jurisdiction of the appeal from that order

## II    A Chronology

The following is a chronology of some of the most significant events relevant to the case.

February 2, 2002.  Peterson and Seaman married in Macon, Bibb County, Georgia.  Peterson was a citizen of the United States and a disabled Army veteran suffering from PTSD (post traumatic stress disorder).  Seaman was a Jamaican citizen holding a "green card" with permanent residence status in the United States.

July, 2002 – May, 2006.  Peterson and Seaman established their family home in the area of Warner Robins, Houston County, Georgia.  During this period they had three children:  T.L.P., C.D.P. and R.T.P.  The elder child, T.L.P. (who was born in Mexico) was 8 years of age at the time the petition was filed in this case.  C.D.P. was age 7, and R.T.P was age 5.

May, 2006.  Peterson and Seaman disposed of their belongings in Georgia, and moved with their three children to Mexico.  They first lived for a brief time in Guadalajara, near Seaman's parents and extended family, and then moved to a more permanent location in nearby Chapala, State of Jalisco, Mexico, on the lake of the same name about twenty five miles south of Guadalajara.  Soon after leaving

the United States, Peterson and Seaman had a fourth child, S.A.D., who was born in Mexico and was 4 years of age at the time of Seaman's petition under ICARA.

February, 2010.  Due to marital discontent, Peterson moved out of the family home in Chapala and established a separate residence nearby.

May, 2010.  Seaman filed suit for divorce in Mexico but Peterson was not served with process.

July, 2010.  After living there for more than four years, Peterson left Mexico and returned to the United States.  Seaman and the four children remained at their home in Chapala.

September 24, 2010.  Peterson returned to Mexico and broke into Seaman's home in an effort to find and take possession of the children's passports.  A confrontation occurred and Peterson left without the passports.  Both parties filed police reports concerning the incident.

September 27, 2010.  Both Peterson and Seaman appeared before the Mexican Municipal Court which issued a "written declaration" that allowed Peterson to spend October 2, 2010, with the children subject to a strict order that they be returned to Seaman's custody by 10:00 p.m. the same day.

October 2, 2010. Peterson took custody of the four children in Mexico and absconded with them to the United States. After a three day trip in Peterson's automobile, they arrived in the Warner Robins area, Houston County, Georgia.[3]

October 6, 2010. Seaman learned that her children were in Georgia.

October 13, 2010. Peterson initiated a "deprivation" action in the Juvenile Court of Houston County, Georgia.[4] His petition alleged that Seaman was affiliated with a religious group known as The Family International whose practices he claimed to be harmful to children. He also alleged that the children had been neglected and had become malnourished while in Seaman's care. The Juvenile Court later entered an order granting temporary custody of the children to Peterson, with rights of visitation to Seaman, but it does not appear that the court ever entered a final order finding the children to be "deprived" or awarding custody to either Peterson or Seaman.

---

[3] The circumstances under which Peterson gained the children's entry into the United States are not clear, but it does not matter because it is not material to any of the issues in the case. The important fact is that he removed the children from Mexico and from Seaman's custody without her permission.

[4] Under Georgia law, the Juvenile Court has jurisdiction over anyone under age 18 who is found to be "deprived," that is, a child who (1) is without parental care or control, subsistence, or education as required by law; (2) has been placed for care or adoption in violation of law; (3) has been abandoned by his parents or custodian; or (4) is without a parent, guardian or custodian. See Ga. Code Ann. § 15-11-2(8)(A-D) (2013); Ga. Code Ann. §§ 15-11-10, 15-11-11 (2014). Thus, the Juvenile Court can decide custody issues with respect to deprived children, but not ordinary custody battles between opposing parents. See In re M.C.J., 271 Ga. 546, 523 S.E.2d 6 (Ga. 1999).

November 30, 2010.  Seaman filed this action under the Hague Convention and ICARA in the district court.

December 9, 2010.  The district court promptly conducted the first of what would become five days of evidentiary hearings (December 9; December 17; December 21; December 31, 2010; and January 13, 2011).

January 14, 2011.  The district court entered its Order granting Seaman's petition and directing that the four children be returned to Mexico.  Peterson was directed to pay the necessary transportation expenses.  The district court stayed its order for ten days to permit Peterson to seek an additional stay from this court.  Peterson did so, but this court denied any further stay on January 28, 2011.

February 8, 2011.  Seaman and the children returned to Mexico.

### III     The Convention and ICARA

The Convention applies to children under sixteen years of age who are "habitually resident" in a contracting state (Convention, Art. 4) and are "wrongfully removed" to another contracting state (Convention, Art. 1).  A child is "wrongfully removed" when (a) the removal "is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident," and (b) at the time of removal the rights of custody "were actually exercised" by the person having those rights (Convention, Art. 3).  The term "rights of custody" includes "rights relating to the care of the person of the

9

child and, in particular, the right to determine the child's place of residence" (Convention, Art. 5).

Under this framework, Seaman was required to prove by a preponderance of the evidence (42 U.S.C. § 11603(e)):  (1) that the children were habitually resident in Mexico at the time Peterson removed them to the United States; (2) that the removal was without Seaman's consent and constituted a wrongful breach of her custody rights under Mexican law; and (3) that she was actually exercising those custody rights at the time of the removal.  Convention, Art. 3; Ruiz v. Tenorio, 392 F.3d 1247, 1251 (11th Cir. 2004).

In deciding the issues of habitual residency and wrongful removal, the courts are expressly prohibited by the Convention (Art. 16 and Art. 19) and by ICARA, 42 U.S.C. §11601(b)(4), from determining the underlying custody issue.  Indeed, the central purpose of the Convention and ICARA in the case of an abducted child is for the court to decide as a gatekeeper which of the contracting states is the proper forum in which the issue of custody should be decided.  See Lozano v. Montoya Alvarez, ___ U.S. ___, 134 S. Ct. 1224, 1228-29 (2014); Abbott v. Abbott, 560 U.S. 1, 9, 130 S. Ct. 1983, 1989 (2010); Ruiz, 392 F.3d at 1250.

The Convention also creates certain defenses that, if established by a respondent, will justify a court in denying relief to the petitioner.  If, for example, the respondent proves by clear and convincing evidence that "there is a grave risk

that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation" the return of the child may be refused. Convention, Art. 13(b); 42 U.S.C. § 11603(e)(2)(A). Or, if more than one year has passed since the wrongful removal and the respondent proves by a preponderance of the evidence that the child "is now settled in its new environment", the return of the child may be refused. Convention, Art. 12; 42 U.S.C. § 11603(3)(2)(B)

## IV    The Standard of Review

In Ruiz, this court treated as a matter of first impression in the circuit, the determination of the proper standard of review applicable to habitual residence issues in child abduction cases governed by the Convention and ICARA. Citing Mozes v. Mozes, 239 F.3d 1067, 1073 (9th Cir. 2001) the Ruiz court concluded:

> We are persuaded by the reasoning of the court in Mozes that a mixed standard of review is appropriate for determining habitual residence. Accordingly, we accept the district court's finding of historical facts unless clearly erroneous, but with regard to the ultimate issue of habitual residence, the appellate court will review de novo, "consider[ing] legal concepts in the mix of facts and law and exercising judgment about the values that animate legal principles." Id.

392 F.3d at 1252.

## V    The District Court's Decision

11

(a) <u>Habitual Residency</u>.  Following the teaching of this court's decision in Ruiz v. Tenorio, 392 F.3d at 1252-53, the district court first determined whether there was a settled intention on the part of Seaman and Peterson to abandon a prior habitual residence and take up a new one.  The testimony of Seaman and Peterson was, of course, in conflict on this point.  Seaman testified that the move from Georgia to Mexico in May, 2006, was intended to be permanent.  Peterson testified that it was intended as an extended vacation and visit with Seaman's parents.  The district court, viewing the objective facts, credited Seaman's testimony and, implicitly if not explicitly, discredited Peterson.[5]  The court noted that the parties sold their possessions in Georgia and took up their own dwelling in Mexico rather than living with Seaman's parents or in temporary quarters such as a hotel; that they enrolled the children in Mexican schools when they reached the appropriate age; that they were absent from the United States from a residential standpoint for more than four years, returning to the United States only a few times for visits of limited duration; that they established legal, temporary residence in Mexico; and,

---

[5]    While the district court did not expressly declare a finding that Peterson was not a credible witness on the issue of habitual residence, its conclusion on the issue was a clear repudiation of his testimony and was in harmony with other segments of the court's order finding, for example, that Peterson had "manipulated" medical evidence concerning alleged malnourishment of the children.

12

according to Seaman, intended to become citizens there.[6]  The district court

concluded on the basis of those findings that, insofar as the parents were

concerned, they either traveled to Mexico intending to stay for a brief period and

then changed their minds in favor of abandoning their Georgia residence, or they

traveled to Mexico already intending to make their new home there.  Either way,

they came to share an intent that Mexico was, or had become, their habitual

residence within the meaning of the Convention and ICARA.

The district court then turned its attention, following the analytical regimen

dictated by Ruiz, 392 F.3d at 1253, to the question whether there had been an

actual change in geography and the passage of a sufficient length of time for the

children to have become acclimatized in the new place of residence.  As stated in

Ruiz, the intention of the parents is a crucial factor, but "cannot alone transform

the habitual residence."  Id.  The district court found this to be an easier call.  The

geographic movement of the children was beyond dispute.  Further, the children

were all acclimatized and settled in Mexico; they were all fluent in Spanish; they

attended and were well adjusted in school in Mexico, the eldest for almost four

---

[6]     The district court also noted that an investigator for the Houston County Department of Family and Children Services testified that, based upon her investigation, it was clear that the Petersons intended to stay in Mexico.

years, while the youngest, though not yet in school, was almost four years of age at

the time of abduction and had never been to the United States.[7]

The district court thus concluded that under both prongs of the analysis

required by Ruiz, the habitual residence of the children at the time of their

abduction on October 2, 2010, was in Mexico.

(b) Wrongful Removal and Seaman's Exercise of Custodial Rights. The

district court next addressed the issue of wrongful removal in violation of

Seaman's right of custody under the law of Mexico. The court found that Seaman

did, indeed, enjoy rights of custody (as distinguished from a lesser right of access)

under Mexican law and that she was actively exercising those rights at the time of

the children's abduction. We find no error in fact or law with respect to either

conclusion, and no further discussion is warranted.[8]

---

[7]    The different circumstances of the Peterson children as individuals based primarily on their ages is a feature of the case that has not been the subject of critical discussion in the district court's decision or in the briefs. The children have largely been treated as one indistinguishable mass. However, to the extent that the acclimatized status of a child becomes an important part of the equation for determining habitual residency, this case demonstrates that there may be significant differences among multiple children. Our affirmance avoids the issue here because the children's habitual residence in Mexico is the least disruptive result for all of them including especially, the youngest. The prospect of a reversal, on the other hand, would require consideration of, possibly, uprooting the youngest – now eight years old – from the only home and culture the child has ever known, not in a determination of custody, but in the process of determining the place of habitual residency of the children as a group.

[8]    The appeal in this case was initially pursued, and Peterson's briefs were filed, pro se. When the appeal was reinstated pursuant to the mandate of the Supreme Court, counsel was appointed to represent Peterson and supplemental briefs were filed   Peterson's original pro se briefs challenged the district court's decision on these issues, but his arguments are unpersuasive. Peterson's pro se briefs presented two other meritless arguments that require no discussion:  (1)

14

(c) <u>Grave Risk to the Children</u>.  The district court devoted much of its attention to the issue of whether the Peterson children should remain in the United States because they would be exposed to grave harm if they were returned to Mexico.  Peterson made two claims in support of this defense that he was required to establish by clear and convincing evidence.  42 U.S.C. § 11603(e)(2)(A); Convention, Art. 13(b).  Those claims were:  (1) that Seaman's family belonged to a religious organization known as The Family International ("TFI") which practices communal living that facilitates or even encourages sexual contact with children; and (2) that the children were malnourished and deprived of needed medical attention.

With respect to TFI, the district court found that although some of Seaman's family members are part of that organization, Seaman herself disavowed her allegiance to TFI approximately 10 years ago, and there was no evidence that the Peterson children had ever been subjected to any improper contact or harmful influence of any kind.

Similarly, the district court determined that the medical evidence initially offered by a physician in Georgia concerning malnourishment of the children in

that the district court either lacked or should not have accepted jurisdiction of this action due to the pendency of the proceedings in state court; and (2) that the children had become settled in Georgia after their brief return of less than one year from Mexico.  <u>See</u> Convention, Art. 12 (providing an affirmative defense where a petition is filed under the Convention more than one year after the child was wrongfully removed or retained, and the respondent can establish by a preponderance of the evidence that the child is now settled in his or her new environment).

general, and the lack of proper medical care of one of them in particular, had been manipulated by Peterson through inaccurate information he had communicated to the doctor.  The court found that, in fact, there was no reliable evidence of neglect or abuse of any kind and that the children were well cared for.

The district court therefore concluded that returning the children to Mexico would not "expose the child[ren] to physical or psychological harm or otherwise place [them] in an intolerable situation."  Convention, Art.13.

Upon careful review, we find no error, much less clear error, in the district court's factual findings rejecting the defense of grave danger.

### VI    Peterson's Claims of Error

(a)  Habitual Residency.  In his dispositive order the district judge stated that the only evidence cited by Peterson to dispute the children's habitual residence in Mexico was the fact that Seaman maintained a mailing address in the United States.  Peterson seizes upon that statement to argue that the judge did not consider other items of evidence that could have supported a contrary conclusion, and that this failure constituted clear error.  Peterson emphasizes, in particular, the evidence concerning the status of the parties under the immigration laws of Mexico and the United States.[9]  Peterson also points to his own testimony concerning his intended

---

[9]    Indeed, though the district judge did recite the parties' establishment of a temporary residency status in Mexico, Peterson takes issue with the court's failure to discuss Seaman's permanent residence status in the United States under the immigration laws, and argues that "the parties' immigration and legal status demonstrates that the habitual residence of the family in this

16

place of residence (that the district court obviously discredited); that Seaman maintained a Georgia driver's license in addition to the Georgia mailing address; and to evidence that Seaman had withheld the children's passports from Peterson during the latter part of their stay in Mexico.

We first observe that Peterson's complaint about the district judge's consideration of the evidence says too much. The judge's statement literally refers to Peterson's argument in the district court, not the content of all of the evidence presented. But, either way, there was no clear error. In Holton v. City of Thomasville School District, 425 F.3d 1325 (11th Cir. 2005), the same kind of claim was made: that the district court in its findings did not mention two items of relevant evidence that would have supported a contrary result, and that such disregard of the evidence amounted to clear error. This court disagreed, saying:

> While these two pieces of evidence are undoubtedly relevant, we cannot conclude that the district court's failure to mention them explicitly in its opinion somehow renders all of its detailed findings concerning intent to discriminate clearly erroneous. For one thing, the evidence presented by both parties at trial was extensive and the record in this case is voluminous. The district

case was, and remained, the United States as a matter of law." (emphasis supplied). Ironically, that statement is simply wrong as a matter of law. Absent evidence of illegal presence in, or impending deportation from, the place of claimed habitual residence (a circumstance not present in this case), see In re Koc, 181 F. Supp. 2d 136, 154 (E.D.N.Y. 2001), immigration status is a factor to be considered, as it was in Ruiz, but it is not controlling. Redmond v. Redmond, 724 F.3d 729, 743 (7th Cir. 2013) ("Determining a child's habitual residence thus requires an assessment of the observable facts on the ground, not an inquiry into the child's or parents' legal status in a particular place.").

17

court was not obliged to recite and analyze individually each and every piece of evidence presented by the parties.

\* \* \* \*

The law is well settled that "[i]f the district court's account of the evidence is plausible in light of *the record viewed in its entirety*, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson, 470 U.S. at 573-74, 105 S. Ct. 1504 (emphasis added). We may reverse the district court only when "on the entire evidence" we are "left with the definite and firm conviction that a mistake has been committed." Id. at 573, 105 S. Ct. 1504 (marks and citation omitted). After reviewing the lengthy record in its entirety, we are left with no such conviction. The pieces of evidence that the Plaintiffs highlight are no doubt significant, but "[w]e cannot overturn the district court's finding of fact simply because this evidence was merely conflicting." Ga. NAACP, 775 F.2d at 1419. Simply put, ample evidence supports the district court's reasoned findings, and we therefore see no clear error.

425 F.3d at 1353-1354.

So, in this case, we find no clear error in the district court's findings of historical fact supporting its ultimate legal conclusion that the habitual residence of the Peterson children was in Mexico at the time of their abduction on October 2, 2010. And, upon de novo review of that legal conclusion in light of the record as a whole, we are not left with the definite and firm conviction that a mistake has been made. On the contrary, while this was a close and difficult case as was Ruiz (see 392 F.3d at 1256), we conclude that the district court got it right when it concluded

18

that the habitual residence of the Peterson children was in Mexico when they were removed from Seaman's custody and brought to the United States.

(b)  Grave Risk of Harm.  We have previously determined that there was no clear error in the district court's factual finding that returning the Peterson children to Mexico posed no grave risk of harm.  Still, the district court noted that the finding of no grave risk was "not to say that the general and somewhat dated information about TFI adduced in this court merits no attention.  However, those concerns should be raised in the court that decides the custody dispute. . . ."  The district court went on to say that

> the Court has established, through the respective Central Authorities of Mexico and the United States, contact with The Hague Convention "network judge" in Mexico . . . .  This order may be supplemented to ensure that the appropriate Mexican authority becomes involved in this matter.  [Peterson's] alleged concerns will be addressed in the appropriate forum and by the proper authorities.

Peterson challenges the district court's handling of the grave risk issue contending that the court:  (1) effectively imposed upon Peterson, contrary to Baran v. Beaty, 526 F.3d 1340 (11th Cir. 2008), the burden of proving that the Mexican courts are unable or unwilling to ameliorate a grave risk of harm; or (2) that the district court effectively deferred a decision on the grave risk defense to the courts of Mexico contrary to Danaipour v. McLarey, 286 F.3d 1 (1st Cir. 2002).  Neither of those decisions are of any help to Peterson because both are easily distinguishable.

19

In Baran, the sole issue was whether a return of the child to his father in Australia would expose him to grave risk of harm due to the father's (Baran's) violent temper.  The district court found that there was a grave risk and declined to order the child's return.  Baran argued on appeal that even when a finding of grave risk has been made, the child should still be returned to his or her place of habitual residence unless the responding parent proves, in addition to grave risk, that the courts of the venue of habitual residency are incapable or unwilling to give the child adequate protection.[10]  Our court rejected that argument and held that once a responding parent proves, by clear and convincing evidence, that a child would face a grave risk if returned to his habitual residence, the responding parent does not have to prove, in addition, that the courts of the requesting state cannot be relied upon to shield the child from that risk.

Here, the district court's concern that the children's exposure to the practices of TFI should be monitored by the court deciding custody issues – if such exposure occurs – was by no means an enlargement of Peterson's burden of proof nor was it inconsistent with the court's finding concerning the lack of a grave risk.  Simply put, in this area of the law, there are grave risks established by clear and convincing evidence, and there are potential risks that are less than grave but bear watching.  Recognizing that distinction is all that the district court did; and in so

---

[10]    Support for this contention flows from the Sixth Circuit decision in Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996).  See Baran, 526 F.3d at 1347.

doing the court did not delegate its responsibility under the Convention or ICARA to the Mexican courts as in Danaipous v. McLarey, supra.[11]

VII    Conclusion

There was no clear error in the district court's factual findings and, after de novo review of the court's conclusions of law resulting in the granting of Seaman's petition, we find no error of law in that result. It follows that the judgment of the district court is in all respects AFFIRMED.

---

[11]    The district court in Danaipous did not decide the issue of grave risk to the children, if they were returned to Sweden, because the court believed that a forensic sexual abuse evaluation was necessary to make that determination and that such an evaluation could best be done in Sweden where the children had habitually resided. The First Circuit held that this was error – the children could not be returned with the defense of grave risk left undecided. In this case, by contrast, the district court decided that there was no grave risk of harm to the children in Mexico and that issue was not delegated to the Mexican courts to determine.