[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15364

_____

D.C. Docket No. 8:17-cv-02100-VMC-JSS

JOHAN SEBASTIAN ALZAT CALIXTO,

Plaintiff - Appellant,

versus

HADYLLE YUSUF LESMES,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

Before JORDAN and ROSENBAUM, Circuit Judges, and MARTINEZ,[*] District
Judge.

JORDAN, Circuit Judge:

In September of 2017, Johan Calixto filed a petition in federal court seeking

the return of his 5-year old daughter, M.A.Y., to Colombia, under the Hague

---

[*]Honorable Jose E. Martinez, United States District Judge for the Southern District of Florida, sitting by designation.

Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, as implemented in the United States through the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* Mr. Calixto had signed a travel consent form allowing M.A.Y. to travel from Colombia to the United States with her mother, Hadylle Lesmes, from November of 2015 until November of 2016. In his petition, Mr. Calixto alleged that Ms. Lesmes had wrongfully retained M.A.Y. in the United States and away from Colombia, her country of habitual residence, beyond November of 2016 and in violation of the Convention.

The district court denied Mr. Calixto's petition for return. It concluded that Ms. Lesmes' retention of M.A.Y. in the United States was not wrongful under the Convention because Mr. Calixto and Ms. Lesmes had shared an intent to change M.A.Y.'s habitual residence from Colombia to the United States, and because M.A.Y.'s habitual residence had subsequently become the United States through acclimatization. The district court did not, however, address whether Mr. Calixto's intent to change M.A.Y.'s habitual residence was conditioned upon his joining Ms. Lesmes and M.A.Y. in the United States or whether that intent was vitiated once Mr. Calixto was unable to come to the United States. The answers to those questions are critical to the proper disposition of this appeal, and because shared intent is a factual determination, we remand for further factual findings.

2

## I

The Hague Convention seeks "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir. 2007). "The [C]onvention is intended as a rapid remedy for the left-behind parent to return to the status quo before the wrongful removal or retention." *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004).

"The Convention and [ICARA] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." *Baran v. Beaty*, 526 F.3d 1340, 1344 (11th Cir. 2008) (quoting 22 U.S.C. § 9001(b)(4)). Thus, "[a] court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." *Ruiz*, 392 F.3d at 1250 (citation omitted). *See also Seaman v. Peterson*, 766 F.3d 1252, 1257 (11th Cir. 2014) ("[T]he central purpose of the Convention and ICARA in the case of an abducted child is for the court to decide as a gatekeeper which of the contracting states is the proper forum in which the issue of custody should be decided.").

## A

Children who are wrongfully removed or retained "are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."

3

22 U.S.C. § 9001(a)(4). The removal or retention of a child in a signatory state is wrongful where

> a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> b) at the time of removal or retention those rights were actually exercised . . . or would have been exercised but for the removal or retention.

Convention, art. 3. *See also Ruiz*, 392 F.3d at 1251.

A petitioner seeking a child's return bears the burden of proving, by a preponderance of the evidence, that the child was wrongfully removed or retained. *See Chafin v. Chafin*, 742 F.3d 934, 938 (11th Cir. 2013); 22 U.S.C. § 9003(e)(1)(A). To prove that a child's retention is wrongful, a petitioner must show that the child was a habitual resident of another country at the time of the retention, that the retention breached his or her custody rights under the law of that other country, and that he or she had actually been exercising those custody rights at the time of retention. *See Chafin*, 742 F.3d at 938. *See also Neergaard-Colon v. Neergaard*, 752 F.3d 526, 531 & n.2 (1st Cir. 2014); *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012); *de Silva v. Pitts*, 481 F.3d 1279, 1285 (10th Cir. 2007).

**B**

Although the Hague Convention concerns children who have been wrongfully removed or retained from their country of habitual residence, neither the Convention nor ICARA defines habitual residence. In *Ruiz*, we cited

4

approvingly one characterization of the phrase as requiring "that the purpose of living where one does has a sufficient degree of continuity to be properly described as *settled*." 392 F.3d at 1252 (emphasis added and citations omitted).

In *Ruiz*, as here, we were concerned with how and when a child's habitual residence might change from one country to another, not with how an initial habitual residence comes to be in the first place. To that end, we decided to follow and adopt the reasoning of the Ninth Circuit in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), and held that "[t]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." *Ruiz*, 392 F.3d at 1252 (citation omitted). "[T]he relevant intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence." *Id*. at 1253 (citations and internal quotation marks omitted). "This settled intention is crucial because there can be no bright line rule with respect to the length of an absence," and we must therefore "pay close attention to subjective intent." *Id*. (citations and internal quotation marks omitted).

In analyzing whether a child's habitual residence has changed, a court must first determine whether the parents or guardians (i.e., the persons entitled to fix the place of the child's residence) shared an intent to change the child's habitual residence. *See id*. The "unilateral intent of a single parent" will not suffice to

5

change a child's habitual residence. *See Redmond v. Redmond*, 724 F.3d 729, 745 (7th Cir. 2013) (citing *Mozes*, 239 F.3d at 1075–77).

As we acknowledged in *Ruiz*, "the difficult cases arise when the persons entitled to fix the child's residence do not agree on where it has been fixed." *Ruiz*, 392 F.3d at 1253. *See also Mozes*, 239 F.3d at 1076. "Although the settled intention of the parents is a crucial factor, it cannot alone transform the habitual residence." *Ruiz*, 392 F.3d at 1253. There must also be "an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized." *Id*. (citing *Mozes*, 239 F.3d at 1078). The evidence required to show acclimatization becomes greater if there was no shared settled intent of the parents to change a habitual residence. *See Chafin*, 742 F.3d at 938 ("[A]fter an initial finding that parents lack a settled intent to abandon their child's prior habitual residence for a new one, the burden on the party asserting a change in habitual residence increases.") (citation omitted).

If there is "no shared settled intent on the part of the parents to abandon the child's prior habitual residence, a court should find a change in habitual residence if the objective facts point unequivocally to a new habitual residence." *Ruiz*, 392 F.3d at 1254 (citation omitted). A change in habitual residence can also be found if a court can "say with confidence that the child's relative attachments to the two countries have changed to the point where requiring a return to the original forum

6

would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Id.* (citation and internal quotation marks omitted).

## II

As in many cases, some facts are undisputed, and some—like those concerning the status of the relationship between Mr. Calixto and Ms. Lesmes in November of 2015 and the circumstances related to the travel of Ms. Lesmes and M.A.Y. to the United States—are hotly contested. We begin with the facts that are not in dispute, and then turn to those that are.

## A

Mr. Calixto and Ms. Lesmes were both born in Colombia. They met there and began a romantic relationship in 2007. On June 17, 2012, Ms. Lesmes gave birth to their daughter, M.A.Y., who lived continuously and exclusively in Colombia until November of 2015. Although the parties quarrel over aspects of their romantic relationship and how long they lived together—more about that later—it is undisputed that the relationship continued, in some form, through at least August of 2015, and that they lived together as a couple at various points during that relationship. Mr. Calixto and Ms. Lesmes were once engaged, but Ms. Lesmes broke off the engagement and the two never married. *See* D.E. 63 at 79–80, 120.

Samir Yusuf, Ms. Lesmes' father, lives in the United States as a permanent resident. *See* D.E. 64 at 109. Ms. Lesmes testified that she had long intended to join him and become a U.S. permanent resident as well. *See* D.E. 63 at 119.  Mr. Yusuf sponsored her application for U.S. permanent residency around 2001–02, *see* D.E. 64 at 109, well before the parties began their relationship. Ms. Lesmes said that she made clear to Mr. Calixto when they began dating her desire to ultimately move to the United States.  *See* D.E. 63 at 119–20.  Ms. Lesmes also explained that, prior to M.A.Y.'s birth, she had spoken with Mr. Calixto about M.A.Y. obtaining U.S. permanent residency.  *See id.* at 123.

In August of 2013, after M.A.Y. was born, Ms. Lesmes obtained U.S. permanent residency.  *See id.* at 122.  To maintain that status, Ms. Lesmes traveled to the United States at least three times between August of 2013 and October of 2015, staying in this country for a total of 17 or 18 months.  *See id.* at 34–36, 82–84; D.E. 64 at 50.   The last of these trips was from November of 2014 to October 31, 2015, when Ms. Lesmes returned to Colombia to help finalize M.A.Y.'s own application for U.S. permanent residency. *See* D.E. 63 at 84, 91, 130, 139.  For these 17 or 18 months, which constituted nearly half of M.A.Y.'s life as of November of 2015, M.A.Y. remained in Colombia in the care of Mr. Calixto, Ms. Lesmes' mother, or sometimes both.

8

Mr. Calixto did not oppose Ms. Lesmes obtaining U.S. permanent residency. In fact he supported it, because the two of them had discussed moving together to the United States, along with M.A.Y., as a family. *See id.* at 37, 93; D.E. 64 at 110–11, 138–39. Mr. Yusuf confirmed that Mr. Calixto and Ms. Lesmes had planned to move to and live in the United States together with M.A.Y. *See* D.E. 64 at 110–11.

To that end, Mr. Calixto encouraged and facilitated M.A.Y.'s obtaining U.S. permanent resident status, and Ms. Lesmes filed an application for her residency in October of 2013. *See* D.E. 63 at 123, 144–45. Mr. Calixto took M.A.Y. to a required medical examination in October of 2015, and did not object to M.A.Y. attending her final application interview on November 5, 2015. *See id.* at 90–91, 93, 112–13, 124. Mr. Calixto testified that he was aware of this final interview, and that it was part of the plan for him, Ms. Lesmes, and M.A.Y. "to come to the United States as a family." *Id.* at 93.

Sometime in November of 2015, Mr. Calixto executed a travel consent form with the Colombian Ministry of Foreign Affairs authorizing Ms. Lesmes to remove M.A.Y. from Colombia. *See* D.E. 44-4. Under Colombian law, Ms. Lesmes could not have legally taken M.A.Y. from Colombia without this consent form. *See* D.E. 63 at 37, 145; D.E. 64 at 78, 142–43. Mr. Calixto signed the travel consent form and provided his fingerprint, but Ms. Lesmes did not need to do the same because

she was not the one providing consent. The travel consent form indicated "November 2015" as the "date of departure from the country of the child," and "November 2016" as the "date of return or entry into the country of the child." *See* D.E. 44-4.

M.A.Y. obtained U.S. permanent resident status on November 24, 2015. On that day, Mr. Calixto accompanied Ms. Lesmes and M.A.Y. to the airport for their trip to the United States. *See* D.E. 63 at 40–41. Mr. Calixto testified that this was a "happy occasion" because it signaled "[a] new beginning in the United States." *Id.* at 40.

After Ms. Lesmes and M.A.Y. arrived in the United States, Mr. Calixto applied for a U.S. tourist visa twice. *See id.* at 99. Prior to M.A.Y.'s travel to the United States, he had also applied twice for a tourist visa. *See id.* Each time his application was denied. *See id.* at 61, 99. Mr. Calixto has not applied for permanent residency in the United States. *See id.* at 100.

Ms. Lesmes and M.A.Y., as U.S. permanent residents, can travel outside of the United States for six months at a time. *See* D.E. 64 at 78–79. Since their arrival in the United States in November of 2016, however, neither Ms. Lesmes nor M.A.Y. has returned to Colombia.

**B**

The parties dispute whether they were still a couple in October of 2015, when Ms. Lesmes returned to Colombia, and in November of 2015, when she and M.A.Y. traveled to the United States. They also dispute the circumstances surrounding the travel consent form executed by Mr. Calixto and M.A.Y.'s departure from Colombia. We set out Mr. Calixto's version first, and then Ms. Lesmes'.

**1**

According to Mr. Calixto, he and Ms. Lesmes generally remained a couple since 2007, except for about 15 days in August of 2015. *See* D.E. 63 at 89; D.E. 64 at 127. He denied Ms. Lesmes' claim that their relationship ended in August of 2015. *See* D.E. 64 at 127. He also denied cheating on Ms. Lesmes. *See* D.E. 63 at 79–80. He says that he found out only in December of 2015—after M.A.Y.'s departure from Colombia—that Ms. Lesmes had begun a relationship with a man in the United States. *See* D.E. 64 at 21, 137–38.

While she was in the United States in 2015, Ms. Lesmes sent voicemail messages to Mr. Calixto calling him "sweetheart" and saying she could not wait to see him. *See* D.E. 64 at 132–33, 136. When Ms. Lesmes returned to Colombia in late October of 2015, the relationship continued and Mr. Calixto and Ms. Lesmes were intimate. *See id.* at 127–28, 137–38.

The two continued with their mutual plan to live together with M.A.Y. in the United States.  As Mr. Calixto put it: "Our arrangement was that she [Ms. Lesmes] would travel to the [United States] with my daughter.  So my daughter being here in the [United States], it would be much easier for us to petition for a reunification."  D.E. 63 at 73.

Ms. Lesmes told Mr. Calixto that she would initiate the paperwork for him to come to the United States after she arrived there, and he trusted her.  *See id.* at 37, 97–98.  She also told him that they could be married civilly in the United States and then get married by the Catholic Church in Colombia once he had his documents.  *See id.* at 74.

Mr. Calixto testified that, at least in his mind, the plan had remained the same throughout Ms. Lesmes' relocation to the United States with M.A.Y. in November of 2015.  *See id.* at 37, 93, 98.  He was aware of M.A.Y.'s final interview at the U.S. Embassy but did not attend the interview.  *See id.* at 112.  He executed the travel consent form with the understanding that he, Ms. Lesmes, and M.A.Y. would live together in the United States, but later realized that Ms. Lesmes had lied to him. *See id.* at 56.  He said that he would not have signed the travel consent form had he known about Ms. Lesmes' ongoing relationship with another man in the United States.  *See* D.E. 64 at 139.  He also explained that by putting a

return date of November of 2016 on the form, he "had the certainty that if things [did] not work out, . . . my daughter would return to Colombia." D.E. 63 at 40.

A week or so after she and M.A.Y. arrived in the United States, Ms. Lesmes told Mr. Calixto that she was fed up with him. *See id.* at 49. At that point he contacted the Colombian Central Authority to try to get his daughter back, but was told that because of the return date on the travel consent form he had to wait until November of 2016 to take action. *See id.* at 51.

In January of 2017, after the expiration of the period set forth in the travel consent form, Mr. Calixto filed an application with the Colombian authorities for M.A.Y.'s return. *See* D.E. 44-5. On September 1, 2017, he initiated the present proceeding by filing a verified petition for return under the Hague Convention. *See* D.E. 6.

**2**

Ms. Lesmes testified that she broke off her engagement with Mr. Calixto because she suspected him of being unfaithful and because of his jealousy. *See* D.E. 63 at 120, 127, 129. Although the two were still boyfriend and girlfriend in November of 2014, when Ms. Lesmes traveled to the United States, the relationship changed in April of 2015 and ended in August of 2015 (while she was still in the United States). *See id.* at 136-37. When the two broke up, Mr. Calixto said he was not going to sign any travel authorizations for M.A.Y., and kept acting

13

as though he and Ms. Lesmes were still a couple. *See id.* at 137-39. Ms. Lesmes said she told Mr. Calixto that she could help him come to the United States only if they were married, but she did not want to continue with him and was not going to marry him. *See id.* at 134, 141, 147.

As for Mr. Calixto's testimony that the two were intimate after her return to Colombia in late October of 2015, Ms. Lesmes denied the claim. She said that Mr. Calixto tried to be romantic with her but she rejected his advances. As a result, he would threaten not to sign any travel authorizations for M.A.Y. *See id.* 141–42.

According to Ms. Lesmes, Mr. Calixto went to M.A.Y.'s final interview at the U.S. Embassy in November of 2015. He had no objection to M.A.Y. obtaining permanent residency in the United States. *See id.* at 144–45. After the interview, Mr. Calixto said that he wanted M.A.Y. to come back to visit him in Colombia a year later, and that is why he put November of 2016 as the return date on the travel consent form. *See id.* at 145; D.E. 64 at 23, 39, 41–42, 47.

Ms. Lesmes agreed that Mr. Calixto found out about her relationship with a man in the United States in December of 2015, after she and M.A.Y. had left Colombia. *See* D.E. 63 at 150; D.E. 64 at 21. Mr. Yusuf refused to help Mr. Calixto find a job in the United States after he accused Ms. Lesmes of sleeping around. *See* D.E. 64 at 114.

14

Ms. Lesmes never took M.A.Y. back to Colombia because Mr. Calixto threatened to take M.A.Y. away, and would not sign any travel consent forms allowing her to leave the country.   *See* D.E. 63 at 152–53.  Ms. Lesmes wants M.A.Y. to remain in the United States because she can have a better quality of life here.  *See* D.E. 64 at 76–77.

## C

The magistrate judge held a two-day evidentiary hearing, and issued a report on October 19, 2017, recommending that the district court deny Mr. Calixto's petition.  The report did not resolve the significant conflicts in the testimony, such as the status of the relationship between Mr. Calixto and Ms. Lesmes in November of 2015, the reason for Mr. Calixto's execution of the travel consent form, and the circumstances surrounding the travel of Ms. Lesmes and M.A.Y. to the United States.

The magistrate judge ruled that Mr. Calixto was exercising custody rights under Colombian law at the time of the retention, and that the retention, if unlawful, would have breached Mr. Calixto's rights.  Framing the critical issue as M.A.Y.'s habitual residence in November of 2016—the date of the alleged wrongful retention—the magistrate judge concluded that at that point M.A.Y.'s habitual residence was the United States, and not Colombia.  As a result, the retention was not wrongful.

15

First, the magistrate judge found that Mr. Calixto and Ms. Lesmes "shared the intent for the United States, not Colombia, to be M.A.Y.'s habitual residence[,]" and that M.A.Y. had acclimated to the United States since her arrival in November of 2015.  D.E. 49 at 9.  The magistrate judge recounted the evidence indicating that Mr. Calixto and Ms. Lesmes had a joint plan for both Ms. Lesmes and M.A.Y. to become U.S. permanent residents, that Mr. Calixto took M.A.Y. to her medical examination, and that he accompanied Ms. Lesmes and M.A.Y. to the airport for their flight to the United States.  *See id.*  At the same time, the magistrate judge acknowledged that the plan called for Mr. Calixto to live in the United States with Ms. Lesmes and M.A.Y.  *See id.*

Second, the magistrate judge rejected Mr. Calixto's reliance on the travel consent form as proof that "his intent for M.A.Y.'s habitual residence to be the United States was conditioned on his ability to join [Ms. Lesmes] and M.A.Y. in the United States."  *Id.* at 10.  Acknowledging (but not resolving) the parties' different understandings about the meaning of the travel consent form, the magistrate judge ruled that, even if Mr. Calixto's testimony were credited, "the evidence nonetheless supports the conclusion that [Mr. Calixto and Ms. Lesmes] shared the intent that M.A.Y.'s habitual residence would change from Colombia to the United States."  *Id.*  "The evidence presented supports a finding that the last shared intent of the parties was to relocate to the United States."  *Id.* at 11.  The

magistrate judge rejected Mr. Calixto's reliance on Hague Convention cases involving travel authorizations, explaining that those cases did not involve the issue of habitual residence, but rather whether parents had consented to the removal of their children.  The cases were also distinguishable, the magistrate judge said, because they involved situations where children were removed without the knowledge of one parent.  *See id.*[1]

On November 8, 2017, the district court adopted the magistrate judge's report and denied the petition.  *See* D.E. 52.  Since her departure on November 24, 2015, M.A.Y. has not returned to Colombia.

### III

The parties do not dispute that Mr. Calixto had custody rights regarding M.A.Y. under Colombian law, that he was exercising those rights, and that M.A.Y.'s retention in the United States—if wrongful—breached those rights. And Ms. Lesmes does not deny that M.A.Y. habitually resided in Colombia from her birth through November of 2015. The critical question, as the district court correctly understood, is whether in November of 2016 M.A.Y. remained a habitual resident of Colombia or whether her habitual residence had changed to the United

---

[1] The magistrate judge also concluded, at the second step of the habitual residence analysis, that M.A.Y. had become acclimated in the United States. *See* D.E. 49 at 12–13. *See also Ruiz*, 392 F.3d at 1253 (explaining that, in addition to a shared intent of the parents, a change in habitual residence requires "an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized"). Because Mr. Calixto does not challenge this ruling, we do not discuss acclimatization any further.

17

States. *See Chafin*, 742 F.3d at 938 (framing the issue as whether "E.C. [the child] was a habitual resident of Scotland immediately before retention in the United States"). If it is the former, Mr. Calixto established a prima facie case requiring M.A.Y.'s return to Colombia. If it is the latter, M.A.Y.'s retention was not wrongful under the Convention, and Mr. Calixto's petition fails. *See Gomez v. Fuenmayor*, 812 F.3d 1005, 1010 (11th Cir. 2016).

A district court's determination of a child's habitual residence under the Convention is a mixed question of fact and law. *See Ruiz*, 392 F.3d at 1252; *Chafin*, 742 F.3d at 938. We accordingly review findings of facts for clear error, but legal determinations and the application of law to the facts *de novo*. *See Chafin*, 742 F.3d at 938. A finding of a shared intent to change a child's habitual residence is a finding of fact subject to clear error review. *See Ruiz*, 392 F.3d at 1252–53; *Chafin*, 742 F.3d at 938.

## A

In a slightly different Hague Convention context, we have considered whether a parent's relocation with a child from one country to another was conditioned upon the occurrence of certain events, and whether the first country would remain the child's habitual residence if those events did not come to pass (or, alternatively, whether there would be a change in the child's habitual residence if the events took place as expected). *See, e.g., Ruiz*, 392 F.3d at 1254 ("Melissa's

18

intent with respect to the move to Mexico [with the children] was clearly conditional."). Other circuits have done the same. *See, e.g., Papakosmas v. Papakosmas*, 483 F.3d 617, 625 (9th Cir. 2007) (affirming district court's finding that parents did not have a shared intent to change habitual residence from the United States to Greece because "the family's move to Greece was 'conditional'"); *Maxwell v. Maxwell*, 588 F.3d 245, 253 (4th Cir. 2009) (affirming district court's finding that parents did not have a shared intent to change habitual residence from the United States to Australia because "[the mother] intended that the move to Australia would be conditional"); *Gitter v. Gitter*, 396 F.3d 124, 135 (2d Cir. 2005) (affirming district court's finding that that parents did not have a shared intent to change habitual residence from the United States to Israel because the mother "only mutually agreed to move to Israel on a conditional basis—namely, that [she] would be satisfied with the new arrangements") (internal quotation marks omitted).

In *Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012), a father left Mexico for New York to find work, leaving behind his wife and six-month old daughter. Three years later, the mother and father arranged for the daughter to be smuggled into the United States and reunited with her father in New York, with the mother following afterwards. *See id.* at 109–10. Although the daughter was successfully brought into the United States, the mother's repeated efforts to enter were blocked, to the point where she was arrested and deported back to Mexico. *See id.* at 110.

19

As the Second Circuit put it (quoting the district court's order), "the plan for the mother to enter the United States and travel to New York had been, and would continue to be, frustrated." *Id*. at 111 (citations and quotations omitted). The father subsequently began to live with another woman and refused to return the daughter to Mexico. *See id*.

The father in *Mota* put forward precisely the same argument that Ms. Lesmes advances here, that "it was the parties' settled intention that [the daughter] move to the United States." *Id*. at 114 (citations and quotations omitted). And, of course, the mother in *Mota* did not debate that she fully intended for the daughter to move to New York. The mother's contention, though, mirrored that of Mr. Calixto here. The mother asserted that her agreement that her daughter would move to New York was contingent on her being able to join her there. The father testified, however, that the parents had never discussed any conditions to the daughter's relocation, and had never discussed what would happen if the mother could not join them in New York. Only the father testified as to the specifics of the agreement between the parents, and he posited that the mother offered no evidence that her intent was conditional. *See id*.

Despite all of this, the Second Circuit agreed with the district court that "it was more likely than not that [the mother] intended for [the daughter] to live in the United States *only if* she herself could join the household and continue to raise her

20

child." *Id*. at 115 (emphasis in original).  The mother was the daughter's primary caretaker for the first three and one-half years of her life, she made repeated attempts to enter the United States, she timely demanded that the father return her daughter when her attempts failed, and she sought help from Mexican authorities and ultimately filed a petition under the Hague Convention to obtain her daughter's return.  *See id*. at 114–15.  In addition, the mother had testified that she never intended for her daughter to live permanently in the United States without her, but "always intended for [her daughter] to be by her side." *Id*. at 115.

The Second Circuit revisited the issue of conditional intent a year after *Mota* in *Hofmann v. Sender*, 716 F.3d 282 (2d Cir. 2013).  In that case, the father (a Canadian citizen) and the mother (a U.S. citizen) met in Canada, married in 2008, and had two sons, the first in 2009 and the second in 2011.  *See id*. at 285–86.  In the fall of 2011, the family began to take steps to move to New York, where the mother's parents lived.  They moved many of their possessions to the home of the mother's parents, made renovations to one of the house's rooms, opened a joint bank account in New York, and transferred large sums of money into that account. *See id*. at 286-87.

The district court concluded that the move to New York was intended to be permanent, as the mother asserted, and not temporary, as the father had argued. *See id*. at 286.  The district court also found, however, that "the parties believed

21

that, if they were relocating permanently to New York[,] they were doing it as a family." *Id.* at 287 (quotations and citations omitted). Even though "this condition may not have been expressly stated, it was understood by the parties, and it certainly was understood by [the father]." *Id.* (internal quotation marks omitted). Throughout 2012, the father attempted unsuccessfully to achieve legal status in the United States. *See id.* at 288. Eventually, in September of 2012, the mother filed for divorce and kept the sons with her, to which the father responded by filing a petition under the Hague Convention. *See id.*

Relying on *Mota*, the district court found that "although [the father] had consented to the children's removal to the United States, that consent was a conditional one, contingent on his accompanying them and residing with them and [the mother] as a family in the United States." *Id.* at 289. The Second Circuit affirmed, agreeing that Canada remained the children's habitual residence. Quoting *Mota*, the Second Circuit reiterated that "if the parents here did not agree that the children would live indefinitely in the United States regardless of their father's presence, it cannot be said that the parents 'shared an intent' that New York would be the children's state of habitual residence." *Id.* at 293 (quotations and citation omitted). Although the parents had a shared intent to relocate to New York, "the extent to which that intent was shared was limited by [the father's] conditional agreement that the relocation was to be accomplished as a family." *Id.*

22

*Mota* and *Hofmann* are persuasive. They are well-reasoned and are consistent with our analysis in *Ruiz* of how conditional intent factors into whether there has been a change in habitual residence.   Simply stated, the intent to change the habitual residence of a child from one country to another can be conditioned on the ability of one parent to be able to live in the new country with the child.  In our view, there is no reason why such a conditional intent cannot be expressed in a document that permits the child to travel to her new country for a limited period of time.  To the extent that the district court here believed that the travel consent form executed by Mr. Calixto could not render his intent about M.A.Y.'s habitual residence in the United States conditional, *see* D.E. 49 at 11–12, it was mistaken.

**B**

Mr. Calixto and Ms. Lesmes disagree about whether they shared an intent to change M.A.Y.'s habitual residence to the United States.  Their dispute revolves around the status of their relationship in November of 2015, and the meaning of the November 2016 return date on the travel consent form.

Mr. Calixto testified that he and Ms. Lesmes were still in a relationship in November of 2015 and that their joint plan was for them to live in the United States with M.A.Y.  He understood the return date on the travel consent form as a binding limitation that required M.A.Y. to be returned to Colombia in November of 2016 if he was not able to join her and Ms. Lesmes in the United States.  In

other words, he only authorized M.A.Y. to be absent from Colombia without him for one year's time.

Ms. Lesmes, on the other hand, testified that she ended her relationship with Mr. Calixto in August of 2015 and told him that she would not marry him or help him come to the United States. Despite the breakup, Mr. Calixto supported M.A.Y. becoming a U.S. permanent resident and living in the United States with Ms. Lesmes. She therefore viewed the November 2016 return date on the travel consent form as signifying only that she had the option to send M.A.Y. to visit Mr. Calixto after a year. It was not a fixed date for M.A.Y.'s permanent return to Colombia.

The district court did not resolve these factual disputes, explaining in part that "[e]ven if [Mr. Calixto's] testimony is credited, the evidence nonetheless supports the conclusion that [Mr. Calixto and Ms. Lesmes] shared the intent that M.A.Y.'s habitual residence would change from Colombia to the United States." D.E. 49 at 10. On this record, we do not believe that the district court could have decided the issue of M.A.Y.'s habitual residence without making factual findings about the state of the relationship between Mr. Calixto and Ms. Lesmes in November of 2015 and the meaning of the return date on the travel consent form. And it could not have resolved the matter of shared intent the way that it did by crediting Mr. Calixto's testimony. We explain why below.

24

If Mr. Calixto's account is credited, it appears that there was no shared intent to unconditionally change M.A.Y.'s habitual residence from Colombia to the United States.   Mr. Calixto and Ms. Lesmes were still in a relationship in November of 2015, and given that reality, it makes sense to think that both parents wanted to move to the United States with M.A.Y. and agreed that—as reflected in the travel consent form—M.A.Y. would return to Colombia within a year, notwithstanding her U.S. permanent residency, if Mr. Calixto was not able to come to the United States.  After all, Ms. Lesmes could not take M.A.Y. out of Colombia without Mr. Calixto's consent.  At the very least, Mr. Calixto himself would have had such a conditional intent.  He tried several times to obtain a tourist visa to join Ms. Lesmes and M.A.Y. in the United States, and the facts the district court pointed to (including Mr. Calixto's support for M.A.Y. obtaining U.S. permanent residence) do not necessarily detract from such a conditional intent.  Indeed, Mr. Calixto testified that Ms. Lesmes lied to him, and ended the relationship after she arrived in the United States with M.A.Y.  He found out only in December of 2015 that she had been having a relationship with a man in the United States, and in that same month he began efforts to get M.A.Y. back.  *See Mota*, 692 F.3d at 114–15; *Hofmann*, 716 F.3d at 287, 289, 292.[2]

---

[2] If Mr. Calixto only had a conditional intent, then there could be no shared intent, and a change in habitual residence could only occur "if the objective facts point unequivocally to a new habitual residence," or if one can "say with confidence that [M.A.Y.'s] relative attachments to

25

If, on the other hand, Ms. Lesmes' account is credited, it appears that both Mr. Calixto and Ms. Lesmes agreed to have M.A.Y. move to and live in the United States regardless of Mr. Calixto's ability to join her and Ms. Lesmes. According to Ms. Lesmes, her relationship with Mr. Calixto ended in August of 2015, and she told him that she would not marry him or assist him in coming to the United States. Mr. Calixto, knowing this, unconditionally supported M.A.Y. obtaining U.S. permanent residency and traveling to the United States for an indefinite period of time with Ms. Lesmes. The travel consent form, seen in this light, may well indicate only that Mr. Calixto wanted to have M.A.Y. return to Colombia for a visit in November of 2016, particularly given that Mr. Calixto did not apply for U.S. permanent residency. If this was the state of affairs, then it is likely that Mr. Calixto and Ms. Lesmes had a shared (and unconditional) intent to change M.A.Y.'s habitual residence from Colombia to the United States. *See Sanchez-Londono v. Gonzalez*, 752 F.3d 533, 540–42 (1st Cir. 2014) (affirming district court's findings that parents had a shared intent to keep the United States as the habitual residence of their child, and that move to Colombia by the mother and child was temporary, even though the mother was not able to rejoin the child in the

---

the two countries have changed to the point where requiring a return to the original forum would now be tantamount to taking [her] out of the family and social environment in which its life has developed." *Ruiz*, 392 F.3d at 1254. Given its findings on shared intent and acclimatization, the district court did not address these two alternative ways of demonstrating a change in habitual residence.

26

United States due to immigration issues). *Cf. Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) ("That Ms. Feder [the mother] did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where Mr. Feder [the father] had found work.").

We recognize that in the context of a bench trial we can "infer[ ] from a district court's explicit factual findings and conclusion [other] implied factual findings that are consistent with its judgment although [they are] unstated." *United States v. $242,484.00*, 389 F.3d 1149, 1154 (11th Cir. 2004) (en banc) (citations omitted). Indeed, we have done so in at least one Hague Convention case. *See Seaman*, 766 F.3d at 1258 & n.5.

But this is not an inflexible rule, and when too many critical factual issues remain unresolved it can prove difficult to figure out what may be permissibly inferred. On this record, we conclude that the district court must resolve the conflicts between the accounts of Mr. Calixto and Ms. Lesmes in order to properly decide the question of M.A.Y.'s habitual residence. *See, e.g., Sovereign Military Hospitaller Order of St. John of Jerusalem of Rhodes and of Malta v. Fla. Priory of the Knights Hospitallers of Sovereign Order of St. John of Jerusalem*, 702 F.3d 1279, 1293–94 (11th Cir. 2012) (remanding for additional factual findings); *Southeastern Fisheries Ass'n, Inc. v. Chiles*, 979 F.2d 1504, 1509–10 (11th Cir.

1992) (same).  To ensure that, at most, only one more appeal will be necessary, the district court should also address on remand whether the evidence presented at the hearing provides either of the alternative means of establishing habitual residence as set forth in *Ruiz*, 392 F.3d at 1254, and may wish to give the parties an opportunity to brief those means.

## IV

The case is remanded to the district court for further factual findings as set forth in this opinion.  When the district court issues its order on remand it should notify the clerk of this court and transmit a copy of the order along with the record as supplemented.  Within 21 days of the district court's order on remand, Mr. Calixto and Ms. Lesmes may file simultaneous supplemental briefs, not exceeding 20 pages, addressing the district court's order on remand.  The panel will retain jurisdiction of this appeal in order to issue a ruling as quickly as possible.

**REMANDED WITH INSTRUCTIONS.**