[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12075

_____

D.C. Docket No. 1:14-cv-24733-KMM

HAYET NASER GOMEZ,

Plaintiff - Appellant,

versus

ALFREDO JOSE SALVI FUENMAYOR,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 5, 2016)

Before MARCUS, JORDAN, and BLACK, Circuit Judges.

MARCUS, Circuit Judge:

In this appeal, we are asked to determine whether significant threats and violence directed against a parent can constitute a grave risk of harm to a child under the Hague Convention on the Civil Aspects of International Child Abduction ("Convention").  During a contentious custody battle in Venezuela over their daughter, M.N., Hayet Naser Gomez ("Naser"), M.N.'s mother, made several threats against M.N.'s father, Alfredo Jose Salvi Fuenmayor ("Salvi").  Those threats assumed a new dimension when actual violence began against Salvi's family.  His girlfriend was shot while driving, minutes after dropping him and his daughter off.  Salvi's mother's car was damaged and vandalized.  In addition, on at least two occasions, drugs were planted in the car.  Fearing for his and his family's safety, Salvi fled Venezuela for the United States, bringing M.N. with him in violation of a Venezuelan court's restraining order.

Naser filed suit in the United States District Court for the Southern District of Florida pursuant to the Convention, seeking her daughter's return to Venezuela. After a two-day bench trial, the district court ruled that, although Naser had made a prima facie case for return by showing that M.N. had been wrongfully removed from Venezuela, return would be inappropriate because an exception to the Convention applied.  Specifically, the district court found by clear and convincing evidence that there is a grave risk that M.N.'s return to Venezuela would expose her to physical or psychological harm.

2

After thorough review and having the benefit of oral argument, we hold that the district court correctly found that the grave risk of harm exception to the Convention applied in this case. Although a pattern of threats and violence was not directed specifically at M.N., serious threats and violence directed against a child's parent can, and in this case did, nevertheless pose a grave risk of harm to the child. Accordingly, we affirm.

## I.

We review a district court's findings of fact for clear error and its legal conclusions and applications of the law to the facts de novo. Chafin v. Chafin, 742 F.3d 934, 938 (11th Cir. 2013). "The clearly erroneous standard is highly deferential and requires that we uphold the district court's factual determinations so long as they are plausible in light of the record viewed in its entirety." Underwriters at Lloyd's, London v. Osting-Schwinn, 613 F.3d 1079, 1085 (11th Cir. 2010) (internal quotation marks omitted). "Whether a grave risk of harm to a child exists under the terms of the Hague Convention is a mixed question of law and fact, which we review de novo." Baran v. Beaty, 526 F.3d 1340, 1345 (11th Cir. 2008).

## II.

Because Naser does not contest the district court's findings of fact -- let alone show that they are implausible in light of the record viewed in its entirety --

the following narrative is drawn from the district court's factual findings and the testimony presented at the two-day bench trial on which those findings were based. See Baran, 526 F.3d at 1342.

This lawsuit arises from a sad and remarkably contentious battle between Salvi and Naser over custody of their four-year-old daughter, M.N.  All three individuals are citizens of Venezuela.  Salvi and Naser were never married and Naser is now married to Anibangel Molina Anais ("Molina").  Beginning in 2012, Naser and Molina made repeated threats against Salvi and his family.  Thus, for example, Molina called Salvi's mother and told her that if Salvi ever returned to Molina's home seeking to visit his daughter, it would be the last thing Salvi did in his life.  Then, in July 2012, Naser and Molina left Venezuela with M.N. and took her to Miami.  Salvi filed a petition under the Convention in the United States District Court for the Southern District of Florida and successfully obtained an order requiring that M.N. be returned to Venezuela in his custody.  During the course of the court proceedings in Miami, the district judge awarded Salvi primary custody of M.N. while granting Naser visitation rights to be exercised in the presence of a court-appointed supervisor, Karina Lapa.  At these visits, which occurred in the United States, Lapa noted Naser's hostility toward Salvi, including hearing threats made over the course of the ten visits she supervised.  Lapa specifically testified that Naser repeated that she was going to make Salvi "pay"

4

for what he had done and said that "something is going to happen" to him when Naser regained custody over M.N.  Lapa relayed these threats to Salvi.  On one occasion, Lapa found Naser's mother standing outside the visitation site, reportedly trying to determine where Salvi was coming from with M.N.  Lapa said that she was "very concerned" about M.N.'s safety.

Upon returning to Maracaibo in Venezuela, Salvi and M.N. went into hiding, preventing Naser from visiting her.  At a Venezuelan court hearing attended by both Salvi and Naser shortly after their return to Maracaibo, Naser was accompanied by armed guards, who also accompanied her to every subsequent court date.

In October 2013, Molina was charged by a federal grand jury sitting in the Southern District of Florida with wire fraud, conspiracy to commit wire fraud, and conspiracy to commit money laundering.  While free on bond, he fled the United States to return to Venezuela.  Later that month, a Venezuelan court ordered a continuation of the United States federal district court's custody arrangement, granting Salvi primary custody.  Upon hearing this ruling, Naser had an outburst in court, threatening to kill Salvi.

Subsequently, Salvi's girlfriend, Claudia Poblete, picked him up from the courthouse; they were followed for several blocks by individuals on motorcycles. Three days later, Poblete dropped off Salvi, Salvi's sister, and M.N. at Salvi's

parents' home after attending a birthday party.  The windows of Poblete's car were tinted black, making it impossible to see inside the vehicle.  While driving home, Poblete was shot at and struck three times.  Additional bullet holes were found in the side of the car, the headrest of the passenger seat, and above the child seat. Salvi testified that he did not know who shot Poblete because he was not present when it happened.  Approximately a week later, Salvi saw Naser at a courthouse in Venezuela and heard Naser telling public defenders there that she was concerned about M.N.'s safety because the earlier shooting had been intended for Salvi.  Salvi had told no one about the incident except the attorney he had met with that day.

The violence continued on November 2, 2013, as several people broke into Salvi's parents' building in Venezuela.  The individuals shattered one of the windows of Salvi's mother's car and spray-painted on the side of the car in Spanish, "You are going to die."  Moreover, Salvi's sister and mother testified that they had seen several men enter the garage that housed the car carrying a package and then leave without the package.  Later, they discovered that a package containing twenty-five glassine envelopes of cocaine had been placed in the mother's car.  Salvi does not know who broke into and defaced his mother's car.

Throughout this timeframe, on approximately five occasions, Naser's brother and several armed men went to schools in Venezuela where Salvi's sister worked, seeking information about when she arrived, whom she traveled with, and

whether her brother came to the school. They offered money to employees at the schools to obtain this information.

On December 20, 2013, a Venezuelan court affirmed the decision granting Salvi primary custody of the child and awarding Naser supervised visits. Just over a week later, Salvi's mother was arrested after a search of her car by the Venezuelan National Guard discovered drugs. She testified that, as with the first time drugs were planted in her car, she did not know who placed the drugs there. The investigation was reportedly unusual and the charges against her were later dropped.

Based on these facts, Salvi testified in federal district court that he feared for his daughter's safety because of the violence directed against him and his family and the possibility that M.N. would live with Molina, who, Salvi claimed, is involved in trafficking drugs. Salvi added that he made several unsuccessful attempts to obtain from the Venezuelan government protection for himself and his family. Eventually, he said that he was advised by government officials to leave the country because he could not be protected in Venezuela.

On February 4, 2014, a Venezuelan court entered an order prohibiting M.N. from leaving the country, pursuant to a request made by Salvi. Nevertheless, on February 8, 2014, Salvi left with his child for the United States after forging the authorization needed from Naser to leave the country. Salvi's mother and sister

had left for the United States several days earlier. On May 7, 2014, the Venezuelan Family Court issued an order revoking Salvi's custody rights. Salvi, his sister, his mother, and M.N. all have pending asylum applications in the United States.

On December 15, 2014, Naser filed a complaint and a petition in the United States District Court for the Southern District of Florida seeking the return of M.N. to Venezuela under the rules found in the Hague Convention on the Civil Aspects of International Child Abduction. The district court conducted a two-day bench trial on the matter on April 6–7, 2015. In the face of multiple witnesses called on Salvi's behalf detailing a long string of violent altercations and threats, Naser called only one witness: a lawyer with no personal knowledge of the facts in this case. After the bench trial, the district court entered a detailed order that declined to order that M.N. be repatriated to Venezuela. The court concluded that, under the Convention, Naser had established a prima facie case requiring the return of her daughter because Salvi had "wrongfully removed the child from her habitual residence in Venezuela." The court determined that the child was a "habitual resident" of Venezuela prior to coming to the United States, that Naser possessed and was exercising her rights of custody at the time of the removal, and that removing M.N. violated Naser's rights of custody. These conclusions are not challenged on appeal.

8

In a portion of the district court's order that the parties dispute, however, the district court concluded that the Convention did not require M.N. to be returned to Venezuela because doing so would cause her to face "a grave risk of harm or to be placed in an intolerable situation." The court highlighted the repeated threats made by Naser and Molina against Salvi and his family, that Molina is a fugitive "who has repeatedly demonstrated a disregard for the law," the repeated presence of armed guards at court hearings, reports that Salvi and his family were followed on multiple occasions, the vandalism and destruction of Salvi's mother's car, the planting of drugs in that car, and the shooting of Salvi's girlfriend. In a key passage, the district court squarely laid the blame for these repeated acts on Naser and Molina:

> The evidence has established that [Naser] and Molina directly made threats, and the evidence also supports the finding that it is highly probable that [Naser] and Molina were involved in the acts of violence against [Salvi] and his family. These acts of violence, although not specifically directed at the child, placed her in a perilous position with a high risk of danger.

Thus, although Salvi had wrongfully removed his daughter from Venezuela, the district court found that M.N. faced a grave risk of harm if she returned to Venezuela. Accordingly, the court denied Naser's petition.

This timely appeal followed.

9

## III.

The sole issue we face is whether Salvi proved by clear and convincing evidence that M.N. would face a grave risk of harm were she returned to Venezuela. This, in turn, requires determining whether threats and violence directed against a parent, but not specifically against the child, can constitute a grave risk to the child within the meaning of the Convention, and whether such threats constituted a grave risk of harm to M.N. in this case. While the proper inquiry focuses on the risk faced by the child, not the parent, we hold that sufficiently serious threats and violence directed against a parent can nonetheless pose a grave risk of harm to a child as well. That is the case here.

## A.

The United States became a signatory to the Convention in 1980. Baran, 526 F.3d at 1344. Congress subsequently implemented the Convention's terms through the International Child Abduction Remedies Act of 1988 (ICARA). 22 U.S.C. §§ 9001–9011. "The Convention seeks to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Chafin, 742 F.3d at 936 (internal quotation marks omitted). Notably, the Convention and its implementing legislation "empower courts in the United States to determine only rights under the

Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4); Baran, 526 F.3d at 1344. Indeed, determining the underlying merits of the child custody claims would run directly counter to the Convention's aims because "the central purpose of the Convention and ICARA in the case of an abducted child is for the court to decide as a gatekeeper which of the contracting states is the proper forum in which the issue of custody should be decided." Seaman v. Peterson, 766 F.3d 1252, 1257 (11th Cir. 2014). Thus, "[w]hen a child has been wrongfully removed from his country of habitual residence, the Convention provides the non-abducting parent with a remedy of return, intended to restore the parties to the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings." Baran, 526 F.3d at 1344.

A federal court called on to adjudicate a petition brought under the Convention follows what amounts to a two-step process. "When a parent files a petition for the return of a removed child, the first question courts must ask is whether the removal was wrongful. If so, the child must be returned 'forthwith' unless the respondent establishes one of the affirmative defenses enumerated in the Convention." Id. Those defenses -- including the "grave risk" exception at issue in this case -- are to be construed narrowly. 22 U.S.C. § 9001(a)(4); Baran, 526 F.3d at 1345. As the Convention's official commentary has noted, narrow

11

interpretations of the exceptions are necessary to prevent them from swallowing the rule and rendering the Convention "a dead letter."    Elisa Perez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session 426 (1980) ("Perez-Vera Commentary"), ¶ 34.[1]  The alternative, "a systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration."  Id.

The central feature of the Convention is the return remedy by which a wrongfully removed child is to be repatriated to her home country for custody determinations.    Abbott v. Abbott, 560 U.S. 1, 9 (2010).    A more detailed discussion of this topic is unnecessary because there is no dispute that Salvi wrongfully removed M.N. from Venezuela, thus creating a presumption that Naser is entitled to have M.N. returned to Venezuela.  Rather, we assess whether Salvi has proven that ordering M.N.'s return would cause her to face a grave risk of harm.

---

[1] Perez-Vera was the official reporter of the Hague Conference and her report is recognized "as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention."  Ruiz v. Tenorio, 392 F.3d 1247, 1252 n.2 (11th Cir. 2004) (internal quotation omitted).  "As the Supreme Court has noted, '[b]ecause a treaty ratified by the United States is not only the law of this land . . . , but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history . . . and the postratification understanding of the contracting parties.'" Blondin v. Dubois, 189 F.3d 240, 246 n.5 (2d Cir. 1999) (quoting Zicherman v. Korean Air Lines Co., 516 U.S. 217, 226 (1996)).

**B.**

The Convention provides for certain defenses to the return remedy where there is a compelling reason for a child not to be returned to her home country. Thus, the Convention recognizes that the policy goal of preventing children from being removed from their habitual residences "gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation." Perez-Vera Commentary at ¶ 29; see also Baran, 526 F.3d at 1348 ("[T]he text of the Convention and the commentaries on it place a higher premium on children's safety than on their return."). The Convention expressly provides:

> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes [the child's] return establishes that –
>
> * * *
>
> b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Hague Convention on the Civil Aspects of International Child Abduction art. 13, Oct. 25, 1980. The party opposing the child's return bears the burden of proving by clear and convincing evidence that a grave risk of harm to the child exists. 22 U.S.C. § 9003(e)(2)(A).

13

Significantly, as explained by the State Department, to invoke the defense, the party seeking to establish the exception must "show that the risk to the child is grave, not merely serious." Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10494-01, 10510 (1986) ("State Dept. Commentary");[2] see also Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000). Thus, "[o]nly evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." State Dept. Commentary at 10510. In this Circuit, the district court is not required to also find that the home country is unable to protect the child from that grave risk of harm. Seaman, 766 F.3d at 1262; Baran, 526 F.3d at 1348. Accordingly, although the district court concluded that "country conditions in Venezuela" indicated that Salvi would be unable to obtain adequate protection for M.N. there, this finding was not necessary to support the court's ruling.

Here, the district court's opinion makes it abundantly clear that Salvi -- M.N.'s primary custodian leading up to her removal from Venezuela -- faces a grave risk of harm if he were to return to that country. Salvi encountered repeated threats on his life from Naser and Molina, the shooting of his girlfriend minutes

---

[2] The State Department's official comments regarding an international agreement are entitled to deference, although they are not binding. Baran, 526 F.3d at 1348 (citing Baxter v. Baxter, 423 F.3d 363, 373 n.7 (3d Cir. 2005)).

after he (and M.N.) had been in the car with her, vandalism of his mother's car, the presence of armed guards associated with Naser and Molina at court hearings, and repeated instances of drugs being planted in his mother's car. The district court also found that it was "highly probable" that Naser and Molina were behind these various incidents. Tellingly, none of the actual facts detailed by the district court have been contested, let alone controverted. Naser presented no evidence at trial to contradict them, nor has she presented anything in this appeal. Thus, she necessarily failed to show that these findings represent clear error by the district court. Rather, she only argues in her brief that not all of the incidents are actually indicative of danger and that there is no direct evidence tying her or Molina to any of them. We are unpersuaded.

Accepting the factual findings of the district court -- which we do in the absence of any showing of clear error -- on this record it is very difficult to avoid reaching the same factual conclusions that the district court reached: that Naser and Molina engaged in a campaign of terror against Salvi and his family that exposed him and the people close to him to a grave risk of harm. Naser nonetheless argues that it was clear error for the district court to conclude that the threats to Salvi's safety and well-being originated with Naser. It was not. The district court clearly made a plausible determination when it found that Naser -- who repeatedly made verbal threats against Salvi's life, whose husband had made a verbal threat against

15

Salvi's life, who was frequently accompanied by armed individuals, and whose family members had been seeking out information about Salvi's comings and goings -- was very probably behind the shooting and the other overt acts directed against Salvi and those close to him.  Indeed, the shooting of Poblete occurred just a few days after Naser had threatened to kill Salvi.  There is nothing implausible in the district court's determination that the two events were probably connected.

Naser's stronger argument is that the risk Salvi faces does not necessarily establish a cognizable risk to M.N.  Because the Convention's exception requires a grave risk to the child, Naser contends that any risk Salvi may face would be irrelevant to the current petition.  While Naser appeared to argue in her briefing to this Court that the risk to a parent could not be used to establish a grave risk to the child as a matter of law, her position during oral argument was that, while such a showing was theoretically possible under the law, a sufficient showing had not been made in this case.  Under either line of argumentation, we remain unpersuaded.  We have previously held that, where violence is directed at a parent that may threaten the well-being of a child, the exception found in the Convention may apply.  Moreover, the scope and severity of the threats to Salvi found in this case are clearly sufficient to establish a grave risk to his daughter.

In Baran v. Beaty, 526 F.3d 1340 (11th Cir. 2008), we considered the case of a husband (Baran) seeking the return of his child (Samuel) after his wife (Beaty)

16

had wrongfully removed the child from their home in Australia. Beaty, in opposing Samuel's return, testified to multiple instances where Baran's abuse toward her indirectly threatened Samuel and one instance where Baran's drunken recklessness may have endangered Samuel. Id. at 1342–43. Specifically, "the court heard testimony that Baran had placed Samuel in harm's way by abusing Beaty while she was pregnant, verbally berating Beaty for hours on end while she held Samuel in her arms, and handling newborn Samuel irresponsibly while drunk." Id. at 1346. Notably, however, there was no evidence that Baran had ever intentionally harmed the child or even attempted to do so. Id. But we held that no such showing was necessary. Id. The requisite finding for the exception to apply is not that the child has previously been harmed, but rather that return would "expose him to a present grave risk of physical or psychological harm, or otherwise place him in an intolerable situation." Id. Thus, we concluded, the district court had been presented with enough evidence to conclude that "Baran's violent temper and abuse of alcohol would expose Samuel to a grave risk of harm were he to be returned to Australia." Id.

That a child's proximity to actual or threatened violence may pose a grave risk to the child is echoed by decisions found in our sister circuits. See, e.g., Ermini v. Vittori, 758 F.3d 153, 164 (2d Cir. 2014) ("Spousal violence, in certain circumstances, can also establish a grave risk of harm to the child, particularly

17

when it occurs in the presence of the child."). In <u>Walsh v. Walsh</u>, 221 F.3d 204 (1st Cir. 2000), the First Circuit found that there was a grave risk of harm to the child where the husband had severely beaten his wife over the years, including when she was pregnant; many of the beatings took place in front of her two small children; the husband was a fugitive from charges that he had threatened to kill a neighbor; and he had violated court orders to stay away from the marital residence. Similarly, the Seventh Circuit in <u>Van De Sande v. Van De Sande</u>, 431 F.3d 567 (7th Cir. 2005), concluded that a grave risk of harm to a child had been established where the husband's propensity for violence had been demonstrated by his severe and repeated beatings of his wife in the presence of their children and where he had threatened the children. As the court wrote, "[t]he probability that [the husband], or his mother, another person of violent temper (if the affidavits are true), would some day lose control and inflict actual physical injury on the children (or at least on the daughter) could not be thought negligible." <u>Id.</u> at 570.

Even if the rule that sufficiently serious threats to a parent can pose a grave risk of harm to a child had not been established in this Circuit, we would nonetheless adopt such a rule now. Ruling to the contrary would artificially and unrealistically ignore the powerful effect that a pattern of serious violence directed at a parent may have on his children. Indeed, in this case, gunshots directed at Salvi's girlfriend could have struck M.N. had she been in the car when Poblete was

18

shot. That the shots were not directed at M.N. would be of little moment in such a scenario. Similarly, it requires no stretch of the imagination to conclude that serious, violent domestic abuse repeatedly directed at a parent can easily be turned against a child.

Nor are we persuaded by the cases Naser has offered from other circuits, even if we were not bound by Baran. She cites to Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir. 2000), where the First Circuit held that "verbal abuse and an incident of physical shoving" of the mother were insufficient to establish a grave risk of harm to the child. Notably, the court did not hold that repeated and substantial acts of violence and threats directed against a parent are categorically irrelevant to determining the degree of risk of harm faced by a child. Indeed, the First Circuit had already reached the opposite conclusion in Walsh. The court distinguished Walsh and simply found that the evidence in the case before it, though relevant, was insufficient. Id.; see also Charalambous v. Charalambous, 627 F.3d 462 (1st Cir. 2010) (same). And, of course, the factual foundation in this case revealed a pattern of violence far more extensive and dangerous than an incident of shoving.

Naser also cites to the Eighth Circuit's decision in Nunez-Escudero v. Tice-Menley, 58 F.3d 374 (8th Cir. 1995), and claims that the court held that physical and sexual abuse of the mother was insufficient to establish a grave risk of harm to the child. This is not, however, entirely accurate. While the court there did seem

to discount such evidence, the court ultimately remanded the matter to the district court for a determination of whether the child faced a grave risk of harm. Id. at 378. Here, that determination has been unambiguously made by the district court.

The relevant question before us is whether the violence and threats directed at Salvi and his family pose a grave risk of harm to M.N. The uncontroverted evidence presented here fully supports the district court's determination. In addition to the repeated verbal threats against Salvi's life, Salvi's girlfriend was shot three times, there were multiple incidents of vandalism and destruction of property, and drugs were planted in Salvi's mother's car. The shooting warrants particular note. While M.N. was not in the car at the time of the shooting, she had been there only minutes earlier and one of the bullets struck just above the child seat. Moreover, the dark tinting of the windows made it impossible to see who was in the car at the time the shots were fired. The severity of the tragedy that was narrowly avoided underscores the grave risk of harm that M.N. faced from Naser's campaign against Salvi. Even setting aside the risk of physical harm, the Convention's exception also applies to the grave risk of psychological harm. It seems almost self-evident that a child raised in an environment where one parent is engaged in a sustained campaign of violence (including the use of deadly force) against the other parent faces just such a grave risk.

Nonetheless, in the face of all of this, Naser argues that none of these incidents directly affected M.N.  To the extent she is arguing that no physical harm has yet come to M.N., she is correct.  But, as we held in <u>Baran</u>, the inquiry under the Convention is not whether the child had previously been harmed.  Rather, the question is whether returning the child to Venezuela would expose her to a grave risk of harm going forward.  The uncontroverted evidence of intended and actual violence -- including the shooting -- directed at Salvi and his family yields every indication of posing a grave risk to those around him, including his daughter.  The district judge correctly found that clear and convincing evidence supported a determination that M.N. would face a grave risk of harm if she were to be returned to Venezuela, and that Naser's petition should be denied.  The judgment of the district court is affirmed.

**AFFIRMED.**