[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13436
Non-Argument Calendar

_____

D.C. Docket No. 1:19-cv-22689-MGC


KAREN BERENGUELA-ALVARADO,

Plaintiff - Appellant,

versus

ERIC CASTANOS,

Defendant - Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 25, 2020)

Before WILLIAM PRYOR, JORDAN and NEWSOM, Circuit Judges.

NEWSOM, Circuit Judge:

In this appeal, Karen Berenguela-Alvarado seeks the return of her daughter—whom we'll call EICB—to Chile from Florida, where she is currently living with her father, Eric Castanos.  Berenguela-Alvarado had permitted EICB to visit Castanos in the United States from December 2018 to March 2019.  Castanos never returned her to Chile.  Berenguela-Alvarado consequently initiated Hague Convention proceedings in federal district court to get her daughter back.  The district court found that although Berenguela-Alvarado had made out a prima facie case that Castanos had wrongfully retained EICB, Berenguela-Alvarado had consented to that retention and therefore wasn't entitled to EICB's return.  Because we conclude that the district court made critical errors of fact and law in its order, we vacate and remand this case for further proceedings.

**I**

**A**

Berenguela-Alvarado, a Chilean citizen, and Castanos, a naturalized U.S. citizen, are the parents of EICB.  Castanos met Berenguela-Alvarado during a trip to Chile, and EICB was subsequently born in Chile in September 2012.  EICB is a dual citizen of Chile and the United States, but since her birth she has consistently lived in Chile with her mother.  Castanos has acknowledged EICB as his daughter since she was three months old, and he has reliably provided child support and had regular contact with her since then, making several visits a year to Chile.

2

EICB visited Castanos in the United States for the first time in February 2018; she stayed with him for two months and then returned to Chile. Berenguela-Alvarado later gave EICB permission to travel to the United States a second time. Castanos bought EICB a round-trip airline ticket for the trip, with a departure date of December 30, 2018, and a return date of February 28, 2019. Berenguela-Alvarado gave permission for EICB to stay in the United States until the end of March in the event Castanos kept her longer than originally planned, as he had on her previous visit.

In early February 2019, during EICB's second visit to the United States, Castanos "proposed" to Berenguela-Alvarado that EICB stay with him in the United States permanently, as he felt he could provide a better life for her here. Berenguela-Alvarado resisted, telling Castanos that she didn't want EICB to "think that [she] had abandoned her." Berenguela-Alvarado testified that in response to her resistance, Castanos "started pressuring" her to let EICB stay with him. As a result, she asserted that she "tentatively agreed" to Castanos's proposal, to ensure that she would see EICB in July 2019, at a minimum—the terms of Castanos's deal being that EICB would stay with him in the United States, that the two would go to Chile in July to visit Berenguela-Alvarado, that Berenguela-Alvarado could visit EICB once a year in Miami, and that she wouldn't have to pay any child support. Berenguela-Alvarado said that she "agreed only because she just wanted her

3

daughter to come back in July," and that when she began to "express[] hesitation and s[eek] clarification [as] to what was going on," Castanos—this is important—"threatened to hold [EICB] for good and told [Berenguela-Alvarado] she would never see her [daughter] again."

To effectuate his plan, Castanos enlisted the help of his friend Doris Baquero, who worked at the Florida Department of Juvenile Justice. Baquero sent Berenguela-Alvarado a letter to sign that purported to give consent for EICB to stay in the United States with Castanos. The consent letter, dated February 10, 2019, stated as follows:

> Effective May 5, 2019, I, Karen Edith Berenguela Alvarado, is giving consent to my daughter, [EICB], . . . to reside with her father, Eric Castanos, in the United States. [EICB] will be residing in the United States for the purpose of improving her quality of life, education, physical health and nutrition. Eric Castanos will fully be responsible for [EICB's] housing, nutrition, clothing, education, personal hygiene and physical health.
>
> [EICB] will visit her maternal family in Chile the months of summer break from school in the United States.
>
> Karen Edith Berenguela Alvarado is in full agreement with this letter and her signature confirms her knowledge and consent.

Berenguela-Alvarado testified that she felt that she "was under pressure" and that she "said yes" to Castanos's proposal "because otherwise he wouldn't bring [EICB] back." She further testified that Castanos "was going to request custody if

4

[she] didn't sign the document." So, she says, although she signed the letter, she didn't intend to consent to EICB staying in the United States permanently.

As part of their plan, Castanos and Baquero asked Berenguela-Alvarado to renew EICB's U.S. passport and have the consent letter notarized. Berenguela-Alvarado renewed EICB's U.S. passport in February 2019, but she ultimately skipped two appointments that she had scheduled at the local U.S. embassy to get the letter notarized. Instead, she texted Baquero a picture of the signed letter—she never sent the hard copy—which Baquero then notarized outside of Berenguela-Alvarado's presence.

Later in February, Berenguela-Alvarado sent Baquero the following e-mail:

Doris, good afternoon, I appreciate everything, but I changed my mind. I have everything ready for [EICB] to return. Her uniform and school supplies, she starts classes on March 4th at Primary school. It is very important that she starts when it's appropriate so she won't fall behind.

Thanks for everything.

Despite Berenguela-Alvarado's request that EICB be back in Chile before school started, Castanos kept her in the United States after her travel-authorization period ended. This litigation ensued.

**B**

In April 2019, Berenguela-Alvarado filed "a petition for immediate delivery" in a Chilean family court, seeking EICB's return. That same month, she

5

filed a second petition in Chile under the Hague Convention, followed, in June, by a third petition (which underlies this appeal) under the Hague Convention and the International Child Abduction Remedies Act in the Southern District of Florida. In her U.S.-based case, Berenguela-Alvarado alleged that Castanos had been unlawfully retaining EICB since her travel authorization expired in March 2019, and she insisted that she had never consented to EICB staying in the United States.

Unsurprisingly, Castanos presented a different picture of events. In his response to Berenguela-Alvarado's petition, he raised three affirmative defenses to her claim that he had wrongfully retained EICB: (1) that "there is grave risk of physical and psychological harm" to EICB if she "is returned to Chile"; (2) that EICB "objects to being retu[r]ned and is of sufficient age and maturity" to voice that objection; and (3) that "there was no removal or wrongful detention of [EICB] and no custody rights were breached," because Berenguela-Alvarado "consented to [EICB] going with [Castanos] and at one point even consented to [EICB] staying with [Castanos] permanently." Castanos also alleged that Berenguela-Alvarado had been abusing and neglecting EICB, who he claimed was "malnourished" and suffering from assorted health problems.

The district court held an evidentiary hearing to determine whether Castanos had wrongfully retained EICB. The vast majority of the evidence that Castanos presented bore on his first affirmative defense—namely, that EICB would face a

6

grave risk of harm if returned to Chile—and he and other witnesses testified about EICB's mental and physical health and asserted that she would enjoy a better quality of life in the United States than Chile. Importantly for our purposes, Castano didn't present *any* evidence pertaining to Berenguela-Alvarado's purported consent. Rather, the sole evidence about consent came from Berenguela-Alvarado—she testified that she signed the consent letter because Castanos "said he was not going to bring [EICB] back, and he was going to request custody if [she] didn't sign the document." She further testified that in signing the letter, she did not intend to consent to EICB remaining in the United States permanently.

After the hearing, the district court ordered supplemental briefing on the consent issue. In her supplemental brief, Berenguela-Alvarado reiterated her testimony from the hearing that "she only signed the sham . . . consent form because [Castanos] said she would never see her daughter again if she did not sign." Her brief began this way:

> This is not a case where [Berenguela-Alvarado] flip flopped, was on the fence, or changed her mind. She never consented—period. Her testimony that Castanos told her that she would never see her daughter again unless she signed was uncontroverted. This is not much different than putting a gun to her head and telling her to sign.

Castanos, by contrast, argued that he had established that Berenguela-Alvarado had consented to EICB's retention, as she had signed the consent letter,

subsequently sent an e-mail saying she had "changed [her] mind," and had not presented any evidence of duress. He said that he, on the other hand—and this, too, is important—had "provided testimony that he never threatened or pressured [Berenguela-Alvarado] to sign the consent" letter. He further argued that "[t]he Hague Convention does not provide a mechanism for the revocation of consent once given."

Although the district court agreed with Berenguela-Alvarado that she had established a prima facie case of wrongful retention under the Hague Convention, it held that she was not entitled to EICB's return because it found that she had consented to that retention. The court held that by "sign[ing] a [consent] document, t[aking] a picture of it, and sen[ding] that picture to Baquero," Berenguela-Alvarado had demonstrated "her subjective intent to allow EICB to remain in the U.S." Importantly, the court acknowledged that if Castanos had threatened Berenguela-Alvarado as she alleged, that "statement would amount to duress." But—again, importantly—the Court held that "Castanos denies making this statement and there is no documentary support for Berenguela-Alvarado's assertion." The court then separately found "both Berenguela-Alvarado and Castanos credible" and accordingly "decline[d] to give greater weight to either's testimony."

8

The district court found that Berenguela-Alvarado's evidence concerning her communications with Castanos demonstrated "a contentious relationship" but did "not rise to the level of 'improper and coercive'" behavior so as to satisfy the standard for duress.  The court further rejected Berenguela-Alvarado's argument that the consent letter should be discounted due to its legal deficiencies—it held that although "many questions exist[ed] as to the legal efficacy of the Consent Letter," those questions were irrelevant because a parent's consent doesn't have to be formal under the Hague Convention.  Finally, the court rejected the argument— which it erroneously attributed to Berenguela-Alvarado, for she hadn't made it— that "even if she did [consent], she revoked that consent."  The court concluded "that consent, once given, cannot be withdrawn."  Because the court held that "the consent affirmative defense [was] dispositive," it "explicitly decline[d] to consider [the other] affirmative defenses" Castanos raised.

Berenguela-Alvarado appealed the district court's order.  The sole issue on appeal is whether the district court erred in ruling that Berenguela-Alvarado consented to Castanos's retention of EICB.

## II

### A

In an appeal from an order dismissing a petition for return of a child, "[w]e review the district court's findings of fact for clear error and review *de novo* its

9

legal determinations and application of the law to the facts." *Pfeiffer v. Bachotet*, 913 F.3d 1018, 1022 (11th Cir. 2019). A factual finding is clearly erroneous when a review of the entire record leaves us "with the definite and firm conviction that a mistake has been committed." *Seaman v. Peterson*, 766 F.3d 1252, 1261 (11th Cir. 2014) (internal quotation marks and citation omitted). We "give even 'greater deference' to factfindings of the district court that are based on determinations of the credibility of witnesses." *Stano v. Butterworth*, 51 F.3d 942, 944 (11th Cir. 1995) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)).

## B

"Among other functions, the Hague Convention on the Civil Aspects of International Child Abduction"—which the United States has implemented through the International Child Abduction Remedies Act (ICARA)—"establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained." *Pfeiffer*, 913 F.3d at 1023 (quoting 22 U.S.C. § 9001(a)(4)). The Hague Convention's aim is to return children to the country "of their habitual residence" and to "ensure that rights of custody and of access under the law of one . . . [s]tate are effectively respected in the other . . . [s]tates." *Chafin*

*v. Chafin*, 742 F.3d 934, 936 (11th Cir. 2013) (internal quotation marks and citations omitted).

When one parent "wrongfully remove[s] or retain[s]" a child in the United States, the other can file a petition in state or federal court to have the child returned to her country of habitual residence.  22 U.S.C. § 9003(a)–(b), (e)(1)(A). "The central feature of the Convention is the return remedy by which a wrongfully removed child is to be repatriated to her home country for custody determinations." *Gomez v. Fuenmayor*, 812 F.3d 1005, 1011 (11th Cir. 2016).  A court's job when reviewing a petition for the return of a child is limited to "determin[ing] only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4).

A petitioning parent must prove "by a preponderance of the evidence, that her child was wrongfully removed or retained within the meaning of the Convention."  *Chafin*, 742 F.3d at 938 (internal quotation marks and citation omitted).  A removal or retention is "wrongful" if:

a) it is in breach of rights of custody attributed to a person, . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

11

Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, art. 3.

So, here, Berenguela-Alvarado had to prove three elements to establish a prima facie case of wrongful retention: (1) that EICB "was a habitual resident of [Chile] immediately before [her] retention in the United States"; (2) that Castanos's retention breached Berenguela-Alvarado's custody rights under Chilean law; and (3) that Berenguela-Alvarado "had been exercising her custody rights at the time of retention." *Chafin*, 742 F.3d at 938. All agree that Berenguela-Alvarado satisfied her prima facie burden regarding wrongful retention; the parties' dispute focuses exclusively on Castanos's affirmative defense of consent.

## C

If the petitioning parent proves by a preponderance of the evidence that a wrongful removal or retention has occurred, she is entitled to have the child returned unless the retaining/removing parent can establish one of several enumerated affirmative defenses. *See* 22 U.S.C. § 9003(e)(1)–(2); *Gomez*, 812 F.3d at 1011. This Court has held that these affirmative defenses should be "construed narrowly" so as "to prevent them from swallowing the rule and rendering the Convention a dead letter." *Gomez*, 812 F.3d at 1011 (internal quotation marks and citation omitted).

The sole affirmative defense at issue here is consent, which the district court found to be "dispositive." (Indeed, the district "[c]ourt explicitly decline[d] to consider" Castanos's other defenses.) The consent defense requires the retaining/removing parent to prove by a preponderance of the evidence that the petitioning parent "consented to . . . the removal or retention." Hague Convention, art. 13(a); 22 U.S.C. § 9003(e)(2). The petitioning parent's consent needn't be formal, but "it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005). The focus of the court's inquiry should be on the petitioning parent's "*subjective intent*," and should take into account "[t]he nature and scope of the petitioner's consent, and any conditions or limitations" on that consent. *See id.* (emphasis added).

## III

In its analysis of Castanos's consent defense, the district court made critical factual and legal errors. We will address them in turn.

## A

We begin with the factual error. The district court's analysis of the consent defense centered almost exclusively on the consent letter that Berenguela-Alvarado signed. Ironically, it was Berenguela-Alvarado who introduced the letter—in fact, Castanos objected to the letter's admission, arguing that it was hearsay. In any

13

event, with respect to the circumstances surrounding the letter's signing, the district court made a clearly erroneous finding of fact regarding Castanos's testimony.

Although the district court acknowledged that if Castanos had threatened Berenguela-Alvarado as she claimed, it "would amount to duress"—and thus presumably vitiated her consent—it held, as a matter of fact, that "Castanos denie[d] making this statement." That is incorrect. In fact, Castanos *never* actually denied threatening Berenguela-Alvarado. The district court therefore clearly erred in relying on non-existent testimony as a basis for holding that Castanos had shown that Berenguela-Alvarado had consented to EICB's retention in the United States.

Here is what the record actually reflects: Although Castanos denied threatening Berenguela-Alvarado in his answer and in his supplemental brief, he never *testified* that he didn't make the threat. In mistakenly assuming that he had, the district court may well have relied on Castanos's post-hearing brief, which asserted—falsely and without citation—that he "provided testimony that he never threatened or pressured [Berenguela-Alvarado] to sign the consent" letter. (Notably, Castanos never makes that claim on appeal; rather, he says that he "never admitted" to threatening Berenguela-Alvarado—which isn't the same. Br. of Appellee at 20).

14

To be clear, none of the testimony that Castanos *did* give could be interpreted as constituting a denial that he threatened Berenguela-Alvarado. He testified, for instance, that when he picked up EICB from her home in Chile, he "never" harassed Berenguela-Alvarado, but he also admitted that he had spoken to Berenguela-Alvarado "in a slightly harsh tone" when discussing the way that he thought she treated EICB. In our view, none of this testimony constitutes what the district court claimed—a "deni[al]" that Castanos threatened Berenguela-Alvarado to get her to sign the consent form.

So, in short, the district court clearly erred by relying on non-existent testimony. Castanos never denied threatening Berenguela-Alvarado, as he falsely claimed in his supplemental brief and as the district court found. Thus, we are left "with [a] definite and firm conviction that a mistake has been committed." *Seaman*, 766 F.3d at 1261 (internal quotation marks and citation omitted).

**B**

In addition to this clear factual error, the district court also committed a significant legal error. As already explained, once a petitioning parent has established a prima facie case of wrongful retention/removal under the Hague Convention, the burden shifts to the retaining/removing parent to prove one or more affirmative defenses—without proof of one of those defenses, the child must

15

be returned to the petitioning parent. *See* 22 U.S.C. § 9003(e)(1)–(2); *Gomez*, 812 F.3d at 1011.

Here, though, the district court improperly—but expressly—shifted the burden *back* to Berenguela-Alvarado on the consent issue, erroneously treating her allegation that she signed the consent letter as a result of Castanos's threat as a formal allegation of "duress" that she had to prove by a preponderance of the evidence. The court's opinion leaves no mistake; it expressly found that "Berenguela-Alvarado ha[d] not shown by a preponderance of the evidence that her consent was the product of duress."

This was improper. When it came to the consent defense, *Castanos*— alone—had the burden to prove by a preponderance of the evidence that Berenguela-Alvarado had actually, subjectively intended to allow EICB to remain in the United States. *See* 22 U.S.C. § 9003(e)(2)(B); Hague Convention, art. 13(a); *Baxter*, 423 F.3d at 371. The Hague Convention does not list any "sur-defenses" to its enumerated affirmative defenses, nor does it lay out any sort of framework for shifting the burden back to the petitioning parent after she has made out her prima facie case of wrongful retention/removal. *See* Hague Convention, art. 13(a). Accordingly, Berenguela-Alvarado had no burden to prove anything related to Castanos's consent defense. Her "duress"-related testimony was simply aimed at calling into question whether the consent letter was truly reflective of her

16

subjective intent.  By stating that she was effectively coerced into signing the letter—an issue that bore directly on her consent—Berenguela-Alvarado didn't somehow conjure up a new affirmative sur-defense that she had to prove.

The district court therefore erred as a matter of law in shifting the burden of proof to Berenguela-Alvarado.

## IV

These factual and legal errors—namely, the court's objectively incorrect finding that Castanos testified that he didn't threaten Berenguela-Alvarado and its mistaken decision to shift to Berenguela-Alvarado the burden to prove "duress"— tainted the rest of the district court's analysis too severely to salvage its order.

First, the district court conducted the bulk of its analysis under the auspices of its erroneous "duress" framework, which placed the burden on the wrong party. As already explained, Castanos submitted no evidence pertaining to consent, even though he had the burden to prove the defense.  Nevertheless, the district court wrongly held against Berenguela-Alvarado that *she* submitted no evidence of the explicit threat at issue.  Accordingly, the court's interpretation of the evidence concerning Berenguela-Alvarado's subjective intent is inextricably linked to the faulty presumption that she had the underlying burden of proof, not to mention the fact that the court was operating under the erroneous assumption that Castanos had denied making the threat in the first place.

17

Although the district court focused on the consent letter, it did—at least briefly—advert to several other pieces of evidence that it thought were indicative of Berenguela-Alvarado's subjective intent. In particular, the court thought that Berenguela-Alvarado subjectively intended to consent but then changed her mind. It's true that Berenguela-Alvarado got EICB's U.S. passport renewed and that she scheduled two appointments at the U.S. embassy to get the consent letter notarized. But Berenguela-Alvarado contends that renewing EICB's U.S. passport was necessary in order to have her returned to Chile as planned in March. And Castanos does not dispute that Berenguela-Alvarado never followed through on either of the two appointments at the U.S. embassy—indeed, Berenguela-Alvarado says that she skipped them to try to stall for time so she could get EICB back in March, when EICB's visit was due to expire. Accordingly, this evidence is at best ambiguous with respect to Berenguela-Alvarado's subjective intent, particularly since the district court found her credible. Plus, the only testimony that directly contradicted Berenguela-Alvarado's version of these events was what the district court assumed to be testimony that Castanos never threatened Berenguela-Alvarado—testimony that, as we have explained, he never gave.

The district court also considered the e-mail that Berenguela-Alvarado sent to Baquero stating that she had "changed [her] mind" about EICB staying in the United States. Based on the email, the district court discussed at length whether

18

the Hague Convention permits a party to revoke her consent, erroneously attributing to Berenguela-Alvarado a revocation argument that she has never made (either in the district court or on appeal). Of course, one might infer that if a person changes her mind about consenting to something, then she must have previously consented. But in the record as presented to us, Berenguela-Alvarado—who, again, the district court found to be credible—expressly testified that she signed the consent letter as a result of Castanos's threat and that her signature was not indicative of her subjective intent. Berenguela-Alvarado's lone comment in an e-mail to a third party about changing her mind can't overcome her clear testimony, particularly in light of Berenguela-Alvarado's insistence that she was effectively trying to string Castanos and Baquero along to stall for time.

Finally, and most tellingly, the district court's own order shows that if it hadn't concluded—erroneously—that Castanos denied threatening Berenguela-Alvarado, it may well have come out the other way. As already explained, the district court stated that "[t]o be sure," if Castanos had threatened Berenguela-Alvarado, as she claimed, it would have "amount[ed] to duress" and thus arguably vitiated her consent. But, the district court found, "Castanos denies making this statement and there is no documentary support for Berenguela-Alvarado's assertion." To the same effect, the district court distinguished—as "inapposite"—a case cited by Berenguela-Alvarado, *Lindmeier v. Lindmeier*, 867 So. 2d 165 (La.

19

Ct. App. 2004), on the ground that "in that case, the threat was undisputed," which the court found was "[n]ot true here."  So, from the face of the district court's own order, there is good reason to believe that if it had correctly concluded that Castanos's threat was likewise undisputed, it would have decided the case differently.

V

In summary, we hold that the district court erred in the following respects:

1.  As a matter of fact, the court erred by relying on non-existent testimony that Castanos never threatened Berenguela-Alvarado as a means of securing her consent to EICB staying in the United States.

2.  As a matter of law, the court erred by shifting the burden on the consent issue back to Berenguela-Alvarado, requiring her to prove by a preponderance of the evidence that Castanos's threat constituted "duress."

We therefore vacate and remand the district court's order for further proceedings in accordance with this opinion.

**VACATED AND REMANDED.**