[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 21-14519

————————————————

JOSEPH CLIFTON SMITH,

Petitioner-Appellee,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF
CORRECTIONS,

Respondent-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:05-cv-00474-CG-M

————————————————

**ON REMAND FROM THE SUPREME COURT OF THE
UNITED STATES**

Before WILSON, JORDAN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

This matter returns to us on remand from the Supreme Court. *Hamm v. Smith*, No. 23-167, 604 U.S. ___, 2024 WL 4654458, at *1 (U.S. Nov. 4, 2024) (per curiam). Previously, we affirmed the district court's order granting Joseph Clifton Smith's 28 U.S.C. § 2254 petition seeking to set aside his death sentence for capital murder because he is intellectually disabled. *Smith v. Comm'r, Ala. Dep't of Corr. ("Smith V")*, 67 F.4th 1335, 1354 (11th Cir. 2023) (per curiam). Alabama sought certiorari, and the Supreme Court remanded the case to us to specify whether we rested our conclusion that the district court did not clearly err in finding Smith had significantly subaverage intellectual function on (a) solely "the fact that the lower end of the standard-error range for Smith's lowest IQ score is 69" or (b) a "holistic approach to multiple IQ scores that considers the relevant evidence, including as appropriate any relevant expert testimony." *Hamm*, 2024 WL 4654458, at *1.

The answer to the Supreme Court's question is (b): a "holistic approach to multiple IQ scores that considers the relevant evidence, including as appropriate any relevant expert testimony." But to be even more precise, based on the complete record, including any relevant expert testimony, we concluded that the district court did not clearly err in its factual findings that Smith suffered from significantly subaverage intellectual function, that he had

significant and substantial deficits in adaptive behavior, and that he manifested those qualities before he turned 18. *Smith V*, 67 F.4th at 1354. We unambiguously reject any suggestion that a court may ever conclude that a capital defendant suffers from significantly subaverage intellectual functioning based solely on the fact that the lower end of the standard-error range for his lowest of multiple IQ scores is 69. And we didn't so conclude the last time we opined in this case.

We summarize below how we reached our determination.

We begin with the law we applied. The Eighth and Fourteenth Amendments prohibit states from executing intellectually disabled individuals. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). A person is intellectually disabled if he (1) has significantly subaverage intellectual functioning, (2) has significant or substantial deficits in adaptive behavior, and (3) has manifested those qualities during his developmental period (before the age of 18). *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002); *see Hall v. Florida*, 572 U.S. 701, 710 (2014). The first prong is at issue on remand, but the question of whether a person has significantly subaverage intellectual functioning often overlaps with whether that person also has significant or substantial deficits in adaptive behavior. *See Hall*, 572 U.S. at 723 (explaining that when diagnosing an intellectual disability, "[i]t is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment").

Generally, a person has significantly subaverage intellectual functioning if his IQ is 70 or lower. *Ex parte Perkins*, 851 So. 2d at

456; *Hall*, 572 U.S. at 711. But the medical community recognizes "that the IQ test is imprecise." *Hall*, 572 U.S. at 723. So each IQ test score has a standard error of measurement that accounts for the margin of error above and below the test-taker's score. *Id.* at 713; *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 640 (11th Cir. 2016). That standard error of measurement "allows clinicians to calculate a range within which one may say an individual's true IQ score lies." *Hall*, 572 U.S. at 713. As a result, the intellectual-functioning inquiry must recognize "that an IQ test score represents a range rather than a fixed number." *Id.* at 723.

For related reasons, qualitative factors are also important. Clinicians who attempt to diagnose whether an individual has significantly subaverage intellectual functioning do not limit themselves to IQ tests; "[i]ntellectual disability is a condition, not a number." *Id.* at 723. That is why the "relevant clinical authorities all agree that an individual with an IQ score above 70 may properly be diagnosed with intellectual disability if significant limitations in adaptive functioning also exist." *Id.* at 712 (citation omitted); *see also id.* ("[A] person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score." (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 37 (5th ed. 2013))).

So for instance, when the standard error of measurement of an individual's IQ score suggests that his true IQ may be less than or equal to 70, he "must be able to present additional evidence of

intellectual disability, including testimony regarding adaptive deficits." *Id*. at 723; *Moore v. Texas*, 581 U.S. 1, 14 (2017) ("Because the lower end of Moore's score range falls at or below 70, the [Texas Court of Criminal Appeals] had to move on to consider Moore's adaptive functioning.").

Here, Smith had multiple IQ scores. And that "complicate[s]" matters. *Hall*, 572 U.S. at 714. On the one hand, consistent scores across multiple tests may help identify a test-taker's true IQ score; we'd expect consistent results to reflect a person's intellectual ability as opposed to random chance. But on the other hand, "because the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning." *Id*. As a result, "[e]ven when a person has taken multiple tests, each separate score must be assessed using the [standard-error margin]." *Id*. Still, the throughline remains: if a "holistic" review of a person's "multiple IQ scores" does not foreclose the conclusion that he has significantly subaverage intellectual functioning, *Hamm*, 2024 WL 4654458, at *1, "the law requires that he have the opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning over his lifetime," *Hall*, 572 U.S. at 724.

The district court adhered to that legal framework. It first found that Smith had an IQ test score as low as 72, which, according to expert testimony, meant his true IQ could be as low as 69. *Smith v. Dunn ("Smith IV")*, No. 05-CV-00474, 2021 WL 3666808, at

*2–5 (S.D. Ala. Aug. 17, 2021).  So the district court properly accounted for the standard-error range for IQ tests.  And that suggested additional evidence may be required to determine whether Smith has significantly subaverage intellectual functioning.  *Hall*, 572 U.S. at 713, 724.

Then, the district court properly considered the "complicat[ing]" factor of Smith's other IQ scores.  *Id.* at 714.  It assessed whether Smith's IQ test results, taken together and in context of expert testimony, foreclosed the conclusion that Smith had significantly subaverage intellectual functioning.  *See id.*  It evaluated the rebuttal from Dr. King (Alabama's expert) that Smith's "multiple IQ scores"— 75, 74, 72, 78, and 74—"taken over a long period of time place him in the borderline range, functioning just above intellectual disability."  *Smith IV*, 2021 WL 3666808, at *3.  The district court accepted that Dr. King's logic "leans in favor of finding that Smith does not have significant subaverage intellectual functioning."  *Id.*  But it ultimately determined that Dr. King's testimony was not "strong enough to conclude that Smith is not intellectually disabled without considering evidence of his adaptive deficits."  *Id.* As the district court explained, "Smith did not consistently score so high that the [c]ourt is confident that the lowest score can be thrown out as an outlier or that the standard error for the" other tests, which individually suggest Smith's true IQ may be 70 or lower, "can be disregarded."  *Id.*  So the district court "move[d] on to consider" Smith's "adaptive functioning."  *Moore*, 581 U.S. at 14.

We held that that was a proper application of governing law. In recognition that "[i]ntellectual disability is a condition, not a number," *Hall*, 572 U.S. at 723, the district court evaluated the body of evidence that Smith's IQ scores represent. When it found that Smith's IQ scores could not rule out the possibility that Smith is intellectually disabled, it followed the law's requirement that individuals must be able to present, and the district court must consider, additional evidence of their intellectual disability, including evidence of the individual's adaptive deficiencies. *Id*. at 724.

No part of the district court's analysis contained legal error. So we could reverse the district court's determination that Smith was intellectually disabled only if its factual findings were clearly erroneous. *See Ledford*, 818 F.3d at 632 ("A determination as to whether a person is intellectually disabled is a finding of fact." (cleaned up)).

"Clearly erroneous" is a "highly deferential standard of review." *Holladay v. Allen*, 555 F.3d 1346, 1354 (11th Cir. 2009) (citation omitted). "A finding that is plausible in light of the full record—even if another is equally or more so—must govern." *In re Wagner*, 115 F.4th 1296, 1305 (11th Cir. 2024) (quoting *Cooper v. Harris*, 581 U.S. 285, 293 (2017)) (cleaned up). In fact, we've said that we must accept a district court's factual findings on clearly erroneous review "unless [they are] contrary to the laws of nature, or [are] so inconsistent or improbable on [their] face that no reasonable factfinder could accept [them]." *United States v. Ramirez-*

*Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (quoting *United States v. Eddy*, 8 F.3d 577, 580 (7th Cir. 1993)).

And here, the district court's resolutions of the parties' factual disputes are not so inconsistent or improbable that no reasonable factfinder would accept them. To the contrary, the full record at least plausibly supports the district court's findings.

First, the record evidence plausibly supports the district court's finding that Smith's true IQ score could be less than or equal to 70. As Smith's experts testified, four out of Smith's five IQ scores are consistent with an intellectual disability. *See Smith V*, 67 F.4th at 1345–46. Smith's scores of 74, 75, 72, and 74 all fell within the "range of about 65 to 75" that is "consistent with mild intellectual disability." *Id.* at 1342; *see also Hall*, 572 U.S. at 713 ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). . . . [T]his involves a score of 65–75." (citation omitted)); *Moore*, 581 U.S. at 14 ("Moore's score of 74, adjusted for the standard error of measurement, yields a range of 69 to 79.").

And although Smith scored a 78, Smith's experts testified that the consistent evidence that Smith may have significantly subaverage intellectual functioning "trump[s] an overall score on one administration." *Smith V*, 67 F.4th at 1346. So expert evidence supported the district court's ultimate decision that Dr. King's testimony was not "strong enough to conclude that Smith is not intellectually disabled without considering evidence of his adaptive

deficits." *Smith IV*, 2021 WL 3666808, at *3. And the district court's decision in this regard fell within the range of permissible conclusions the court could reach based on this record. As a result, we determined that the district court did not clearly err in considering evidence of Smith's adaptive deficiencies. *Smith V*, 67 F.4th at 1347–50.

Second, and relatedly, we ruled that the district court did not clearly err in concluding Smith has significantly subaverage intellectual functioning. The additional evidence of Smith's adaptive deficiencies plausibly supports the district court's reasoning that although Smith scored above 70 on IQ tests, his "actual functioning is comparable to that of individuals with a lower IQ score." *Smith IV*, 2021 WL 3666808, at *5 (citation omitted); *see Hall*, 572 U.S. at 723 (same). The district court found that "Smith has significant deficits in social/interpersonal skills, self-direction, independent home living, and functional academics." *Smith IV*, 2021 WL 3666808, at *11. And it entered that finding after considering all the expert testimony, including the experts' analyses of Smith's school records and the tests the experts administered to Smith before the evidentiary hearing. *See Smith V*, 67 F.4th at 1349–54.

But in the end, the district court's finding that Smith is intellectually disabled "largely [came] down to which expert" the district court "believed." *Smith IV*, 2021 WL 3666808, at *11. The district court found Smith's experts more persuasive in part because Dr. King's prior testimony contradicted his criticism of Smith's experts' methods. *Smith V*, 67 F.4th at 1350. And because

we cannot disturb the district court's findings as to Dr. King's credibility, *see Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1357–58 (11th Cir. 2020), it follows that the opinions Smith's experts drew from a test that Dr. King previously praised at least plausibly support the district court's finding that "Smith has shown by a preponderance of the evidence that he has significantly subaverage intellectual functioning and significant deficits in adaptive behavior," *Smith IV*, 2021 WL 3666808, at *11.

For the reasons we set forth in *Smith V*, and now clarify above, we concluded that the district court used a "holistic approach to multiple IQ scores that considers the relevant evidence, including as appropriate any relevant expert testimony," *Hamm*, 2024 WL 4654458, at *1, when it determined Smith is intellectually disabled. We then concluded that none of the district court's findings were clearly erroneous; the full record plausibly supports each of them. *In re Wagner*, 115 F.4th at 1305. So we affirmed the district court's judgment vacating Smith's death sentence.